**NORTH CAROLINA DIVISION OF SERVICES FOR THE BLIND and Timothy M. Jones, Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

**KCA Corporation, Intervenor–Defendant.**

No. 02–215C.

United States Court of Federal Claims.

Aug. 2, 2002 [1].

---

[1]. This opinion was issued under seal on June 7, 2002. Pursuant to ¶ 3 of the ordering language, the parties were requested to identify protected/privileged material subject to deletion. No deletions were requested.

Richard E. Slipsky, North Carolina, attorney for plaintiff, North Carolina Division of Services for the Blind, with whom was Roy Cooper, Attorney General.

Peter A. Nolan, Austin, Texas and Andrew D. Freeman, Baltimore, Maryland, attorneys for plaintiff, Timothy M. Jones.

Thomas L. Koger, Washington, D.C., with whom were Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Donald E. Kinner, Assistant Director, for defendant. Jeffrey B. Rosen, Washington, D.C. and J. Mackey Ives, Arlington, Virginia, of counsel.

Christopher Solop, Ridgeland, Mississippi, attorney for intervenor-defendant. William R. Purdy and Lynn Hawkins Patton, Ridgeland, Mississippi, of counsel.

## OPINION

BUSH, Judge.

This is a post-award bid protest in which plaintiffs, North Carolina Division of Services for the Blind (NCDSB) and Timothy M. Jones, seek a declaratory judgment that the Randolph–Sheppard Act (Act), 20 U.S.C. §§ 107 *et seq.*, applies to the United States Department of the Army's (Army) contract for full food and dining facility attendant services at Fort Bragg, North Carolina. Plaintiffs also seek permanent injunctive relief: (1) enjoining the Army from exercising any options under the contract and from soliciting a new contract without applying the Randolph–Sheppard Act to the solicitation; and (2) requiring the Army to resolicit a contract for the operation of full food and dining facility attendant services at Fort Bragg under the Randolph–Sheppard Act.

This matter is currently before the court on the parties' cross-motions for summary judgment on the administrative record and oppositions thereto. For the reasons set forth below, defendant's motion for summary judgment on the administrative record is granted and plaintiff's motion for summary judgment on the administrative record is denied.

## BACKGROUND

### I. The Statutory and Regulatory Scheme of the Randolph–Sheppard Act

Congress enacted the Randolph–Sheppard Act in 1936, amending the Act twice, in 1954 and 1974. Pub.L. No. 732, ch. 638, 49 Stat. 1559 (1936); Sec. 4(a), Pub.L. No. 83–565, ch. 655, 68 Stat. 652, 663–65 (1954); Pub.L. No. 93–516, §§ 200–11, 88 Stat. 1617, 1623 (1974), codified at 20 U.S.C. §§ 107–107f (1994 and Supp. V 1999)[2]. The purpose of the statute is to provide remunerative employment and enlarge economic opportunities for the blind by authorizing blind persons licensed under the statute to operate vending facilities on federal property. 20 U.S.C. § 107(a).

The 1974 amendments to the Act expanded the statute in many ways to increase the fair treatment of blind vendors and to provide oversight of the Act's application in the federal government, among other objectives. SENATE COMM. ON LABOR AND PUBLIC WELFARE, RANDOLPH–SHEPPARD ACT AMENDMENTS OF 1974, S. REP. NO. 93–937 (1974), *reprinted in,* 1974 U.S.C.C.A.N. 6417. The 1974 amendments, in part, resulted in: (1) priority (as opposed to preference) for blind vendors operating vending facilities on federal property; (2) the inclusion of sections on arbitration for both aggrieved blind vendors and state licensing agencies (SLAs); and (3) the addition of a subsection requiring the Secretary of the Health, Education and Welfare Administration (now the Department of Education ( DOE)) "to establish a priority for operation of cafeterias by blind vendors," with certain limitations. SENATE COMM. ON LABOR AND PUBLIC WELFARE, RANDOLPH–SHEPPARD ACT AMENDMENTS OF 1974, S. REP.

No. 93–937 (1974), *reprinted in,* 1974 U.S.C.C.A.N. 6419–20.

As a result of the 1974 amendments, the statute currently states that "[i]n authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency ..." 20 U.S.C. § 107(b). Additionally, pursuant to the statute, the Secretary is directed to designate an SLA in each state. 20 U.S.C. § 107a(a)(5). These SLAs license blind persons for the operation of vending facilities on federal property. In issuing licenses, the SLAs are required to give preference to blind persons who need employment. 20 U.S.C. § 107a(b). In the instant case, NCDSB is the designated state licensing agency.

The Secretary of DOE (Secretary) administers the Act and is charged with the duty of prescribing regulations designed to accomplish the purposes of the statute. 20 U.S.C. § 107(b). The regulations must not only assure that priority is given to blind persons but must also ensure that "wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States." 20 U.S.C. § 107(b)(2). The Act further states that:

Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified. A determination made by the Secretary pursuant to this provision shall be binding on any department, agency, or instrumentality of the United States affected by such determination....

20 U.S.C. § 107(b).

The 1974 amendments included the term "cafeterias" in the definition for the term "vending facility." 20 U.S.C. § 107e(7). With regard to cafeterias, the Secretary, who

---

**2.** Unless otherwise indicated, all references are to the 1994 and Supp. V. 1999 version of the United States Code.

has delegated such authority to the Commissioner of the Rehabilitative Services Administration (RSA), is authorized to prescribe regulations establishing priority for blind licensees for the operation of cafeterias on federal property when the Secretary determines "such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise." 20 U.S.C. § 107d–3(e).

In accordance with the Act, the Department of Education's Office of Special Education and Rehabilitation Services promulgated regulations governing this matter. 34 C.F.R. §§ 395.1–395.38 (1999).[3] For the operation of cafeterias[4], 34 C.F.R. § 395.33 applies and states, in relevant part, as follows:

(a) Priority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract or otherwise. Such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible.

(b) In order to establish the ability of blind vendors to operate a cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality ... the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality.... If the proposal received from the State licensing agency is judged

to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section. If the State licensing agency is dissatisfied with an action taken relative to its proposal, it may file a complaint with the Secretary under the provisions of § 395.37.

The Department of Defense (DOD) has also promulgated regulations to implement the Randolph–Sheppard Act. 32 C.F.R. §§ 260–260.6. Section 260.3 sets forth the applicable policy and, in accordance with the Act, the manner in which the priority to blind vendors on DOD-controlled property will be extended. Section 260.3(g) articulates, *inter alia,* that: (1) blind vendors are given priority to operate cafeterias "when the cafeteria operation involved is contracted;" (2) if the SLA submits a proposal and the proposal is not in the competitive range, DOD may award the contract to another offeror "but only after the on-site official confers with the Head of the DOD Component;" and (3) if the SLA submits a proposal that is within the competitive range, DOD will award the contract to the. SLA except as provided in 260.3(g)(1)(iii). Section 260.3(g)(1)(iii) states, in part, that "[t]he contracting officer may award to other than the State licensing agency when the on-site official determines that award to the State licensing agency would adversely affect the interests of the United States and the Secretary, HEW, approves the determination ...." If DOD determines that according the priority would be adverse to the United States' interests, the determination "must be fully justified in writing" and sent to the Secretary for review. 32 C.F.R. § 260.3(f)(2).

---

3. Unless otherwise indicated, all references to the Code of Federal Regulations are to the 1999 version as the events giving rise to this action first occurred in 1999. The 1999 version of the Code of Federal Regulations pertaining to this action is the same as the current 2001 version.

4. The DOE regulations define "cafeteria" as:
... a food dispensing facility capable of providing a broad variety of prepared foods and

beverages (including hot meals) primarily through the use of a line where the customer serves himself from displayed selections. A cafeteria may be fully automatic or some limited waiter or waitress services may be available and provided within a cafeteria and table or booth seating facilities are always provided. 34 C.F.R. § 395.1(d).

The Randolph–Sheppard Act and the DOE regulations set forth dispute resolution procedures. Section 107d–1(a) allows "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program" to submit to an SLA a request for a full evidentiary hearing. If the blind licensee is dissatisfied with the results of the hearing, the blind licensee "may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d–2 of this title ..." 20 U.S.C. § 107d–1(a). The arbitration panel's decision is final and binding on the parties, except as the Act provides. *Id.* Section 107d–1(b) provides that if an SLA determines that a federal department, agency, or instrumentality that controls "the maintenance, operation, and protection of Federal property" fails to comply with the Act or its regulations, including section 107(b)'s limitation and the Secretary's determination regarding the limitation, the SLA may file a complaint with the Secretary. Upon receipt of the complaint, the Secretary shall convene an ad hoc arbitration panel and the panel's decision is final and binding on the parties, except as otherwise provided by the Act. 20 U.S.C. § 107d–1(b). The arbitration panel's decision is "subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5." 20 U.S.C. § 107d–2(a). The DOE regulations mirror the Act's dispute resolution process. *See* 34 C.F.R. § 395.37.

## II. Factual Background

### A. The Solicitation, Evaluation of Offerors and Contract Award

On May 5, 2000, the Installation Business Office (IBO), Directorate of Contracting at Fort Bragg issued Solicitation Number DAKF40–99R–0505 (solicitation) for a cost-plus-award-fee contract to provide full food and dining facility attendant services at Fort Bragg.[5] This contract was issued as a small business set-aside. The solicitation originally provided for a performance period for the contract with a base period from October 1, 2000 through September 30, 2001 and with four one-year option periods.

The proposed contract would supplement "the military's overall operation, management, and control of Fort Bragg dining facilities," providing limited food operations and clean-up services by a contractor. AR at 4274.[6] As in prior years, the soldiers stationed at Fort Bragg would provide for the overall operation, preparation, and control of the fort's dining facilities during contingency operations, deployments, and training cycles. The solicitation required the contractor to provide: (1) full food services at Building T–2954 at Camp Mackall; (2) temporary full-food service for U.S. Army Reserve personnel and Regular Army Small Unit Training personnel at five dining facilities; (3) full-time dining facility attendant services in twenty-eight dining facilities at Fort Bragg; and (4) part-time dining facility attendant services in seven dining facilities. Camp Mackall is the only dining facility at Fort Bragg that is managed and operated primarily by a contractor rather than managed or operated almost entirely by military personnel. While most of the services provided by the awardee would be dining facility attendant requirements, occasionally the contractor would have to provide full food service. For the remaining requirements for full-time and part-time dining facility attendant services, the soldiers would perform cooking, serving and other tasks, while the contractor would "perform sanitation, limited food handling, dishwashing, and similar tasks" further specified in the solicitation. AR at 12.

The solicitation states that the Army will award the contract to the offeror who represents the best value and that, if it is in the government's best interest, the Government

---

5. The food service facilities at Fort Bragg support more than 48,000 military personnel on a daily basis and an additional 3,800 soldiers on a temporary basis, for major training exercises. From October 1, 1999 to September 30, 2000, the 28 dining facilities, which are operated on a full-time basis by military personnel, served 4,316,013 meals.

6. "AR" refers to the administrative record filed by defendant on April 10, 2002 and the additional administrative record documents filed on April 19, 2002.

may reject any or all proposals. The solicitation also sets forth a detailed description of the evaluation factors for contract award.

On June 29, 2001, the government changed the performance period of the contract from October 1, 2000 through September 30, 2001 to October 1, 2001 through September 30, 2002, with four one-year option periods. On July 12, 2000, the Army extended the proposal due date, for the last time, until July 20, 2000.

Twelve offerors, including NCDSB, submitted proposals for the Fort Bragg full food and dining facility attendant services contract. NCDSB's proposal was substantively identical to Mitchco International's (Mitchco) bid proposal. Mitchco and NCDSB planned to form a partnership to perform this contract had the Army awarded NCDSB the contract.

The Fort Bragg contracting officer evaluated bids and proposals in accordance with the factors set forth in the solicitation's Evaluation Plan and Section M. The contracting officer assigned each bid and proposal a series of individual scores and an overall score based on a weighted assessment of how each proposal met the evaluation factors. NCDSB and Mitchco received identical total weighted quality scores of 63.80 out of a possible 100, ranking them as tied for the next to last position. The contracting officer determined a competitive range comprised of the four highest-scoring offerors which had scores of 75.45, 74.59, 74.02 and 70.61, respectively. KCA Corporation, the intervenor, had the highest score. The contracting officer set forth the bases for her assessments in the Army's "Determination of Competitive Range" document.

On June 22, 2001, Cheryl H. Nixon, contracting officer, sent a letter to NCDSB, in accordance with Federal Acquisition Regulation (FAR) 15.503, informing the state licensing agency that the Army had determined that NCDSB's proposal was outside of the competitive range. The letter stated that NCDSB's proposal contained material deficiencies and explained some, but not all, of the material deficiencies found with each factor of the proposal. The contracting officer stated that, due to the material deficiencies, NCDSB's proposal did not have a reasonable chance of being selected for award.

Fort Bragg's contracting officer awarded the contract on November 30, 2001 to KCA Corporation, the offeror with the highest score in the competitive range. The base year performance period of the contract was from December 1, 2001 through September 30, 2002. The first option period will commence on October 1, 2002.

### B. Correspondence Regarding the Applicability of the Randolph–Sheppard Act

In an August 2, 1999 memorandum to the Commander of United States Army Forces Command, Walter H. Warfel, director of contracting, addressed the applicability of the Randolph–Sheppard Act to the solicitation for full food services and dining facility attendant services at Fort Bragg. The memorandum stated that, as in the past, the Army would process the requirement for full food services and dining facility attendant services under one "umbrella" food service contract which would cover all of the facilities. The memorandum also noted that previously the Army had treated the requirement as a small business set-aside.[7] The Army reviewed statistics from the period of April 1, 1998 through March 31, 1999 which indicated that the contractor had served fewer meals than military personnel; there were fewer contractor personnel employed than military personnel; and, there was only one contractor-operated facility as opposed to 25 military-operated facilities. Hence, the Army determined that since its solicitation "contains only one facility which is contractor-operated with military personnel retaining operation of the other 25 facilities," the Ran-

---

7. Prior to 1988, Fort Bragg's food services contract involved a single contract under which a contractor would provide dining facility attendant services to support 43 dining facilities that were managed and operated by soldiers or civil service personnel. Since 1988, the Army at Fort Bragg has issued a single "umbrella" contract to supplement the military personnel operation of food services. This contract included some temporary full-food dining facilities and full-food service facilities.

dolph–Sheppard Act did not apply to its solicitation and the Army would issue the solicitation according to the FAR and applicable supplements. AR at 4291.

On August 24, 1999, NCDSB sent a letter to the Directorate of Contracting at Fort Bragg, Becky McGlothlin, informing Ms. McGlothlin that NCDSB had become aware that Fort Bragg was issuing a solicitation for food service in dining facilities. Via facsimile, on February 28, 2000, NCDSB informed Ms. McGlothlin that it was interested in providing the food service pursuant to the Randolph–Sheppard Act.

On March 3, 2000, Leslie D. Griggs in the IBO's Contracting Division of Fort Bragg sent a letter to NCDSB acknowledging NCDSB's interest in providing food service for the Fort Bragg dining facilities. The letter further states that on August 30, 1999, Fort Bragg was required to submit to the Army, through its higher headquarters Forces Command, an analysis concerning the full food and dining facility services that the solicitation would require so that the Army could determine whether the Fort Bragg solicitation should be offered pursuant to the Randolph–Sheppard Act. After a review of DOD implementation guidance, Fort Bragg reported to its higher headquarters that its food services solicitation did not qualify under the Randolph–Sheppard Act. Forces Command agreed with the Army's assessment and consequently, the Army concluded that it would proceed to issue the solicitation as a small business set-aside, as it had done in the past.

By letter dated May 8, 2000, Clay Pope, Chief of Business Enterprises for NCDSB, reiterated NCDSB's interest in providing food service for Fort Bragg and opined that the Randolph–Sheppard Act gave NCDSB priority. Mr. Pope's letter further stated that NCDSB was requesting an opportunity to negotiate a reasonable contract with the Army for the food services.

On May 11, 2000, Mr. Griggs acknowledged the receipt of NCDSB's March 15,

2000 letter requesting further clarification as to why the Randolph–Sheppard Act did not apply to the Fort Bragg full food and dining facility attendant services contract. Mr. Griggs' letter reiterated the Army's findings contained in his March 3, 2000 letter. On July 10, 2000, John B. DeLuca, Director of NCDSB, wrote a reply letter to Mr. Griggs. In the letter, Mr. DeLuca stated that NCDSB took exception to the Army's position regarding the applicability of the Randolph–Sheppard Act and he stated that NCDSB believed that the Act clearly applied to the award of the proposed contract. Mr. DeLuca enclosed a copy of a memorandum dated November 12, 1998 from Judith A. Miller of DOD which supported NCDSB's position regarding the applicability of the Randolph–Sheppard Act to the Fort Bragg solicitation.[8] Mr. DeLuca's correspondence further states that, by the letter, NCDSB was formally notifying the Army that it wished to submit a bid pursuant to the Randolph–Sheppard Act. In addition, the letter notes that because of the Army's stance, any submission by NCDSB would be futile. Hence, NCDSB requested that the Army immediately acknowledge that the Randolph–Sheppard Act was applicable to the solicitation; that the Army extend the deadline for submission of bids for a reasonable amount of time to allow NCDSB to prepare and submit a bid; and that the Army assure the SLA that its bid would be considered fairly and according to the law. Finally, NCDSB reserved its right to seek further review of the matter through the appropriate channels and claimed "its decision to forego the useless act of submitting a bid because of the Army's illegal position shall not be deemed a waiver of its rights." AR at 567.

On July 12, 2000, Jeanette M. Davis of the IBO responded to Mr. DeLuca's July 10, 2000 letter, acknowledging NCDSB's notice that it wished to submit a bid for the solicitation and its request for an extension of the closing deadline. In this communication, Ms. Davis articulates that the Army declined to

**8.** The court will not set forth the specific contents of this memorandum or any other DOD opinions in the administrative record regarding the applicability of the Randolph–Sheppard Act to cafeterias and other dining facilities since this court's ruling, *infra*, does not rely upon such opinions in any manner.

extend the deadline for submission of proposals because she has concluded that it was not warranted. Ms. Davis stated that because the solicitation was issued on May 5, 2000, NCDSB was aware of the Army's position as of the Army's May 11, 2000 letter, yet did not take issue with the Army's stance until July 10, 2000, two days before the closing date. Thus, she states, the solicitation would have been open for a period of 68 days and it would be unfair to other offerors to extend the closing date. Ms. Davis did, however, indicate that due to ambiguities in the solicitation the Army had extended the closing date for the submission of proposals until July 20, 2000.

On December 6, 2000, Mr. DeLuca sent a letter on behalf of NCDSB to Secretary Richard W. Riley of DOE and Commissioner Fredric K. Schroeder of DOE's Offices of Special Education and Rehabilitation Services requesting that a federal arbitration panel be convened to render a decision determining whether the Army's actions with regard to the solicitation for food service at Fort Bragg were appropriate. By letter to Rebecca McGlothlin, contracting officer at Fort Bragg, on December 19, 2000, Commissioner Schroeder informed the Army of NCDSB's request for an arbitration panel and requested that Ms. McGlothlin notify his office of the status of NCDSB's and the Army's efforts to reach an amicable settlement of the dispute. Commissioner Schroeder stated that his office wanted to encourage the parties to employ all reasonable efforts to reach an amicable settlement. On August 8, 2001, Mr. DeLuca sent a letter to Commissioner JoAnn Wilson of DOE's Offices of Special Education and Rehabilitation Services noting that the RSA had granted NCDSB's request that "arbitration be held in abeyance as the result of an active court case dealing with the same issue" and notifying the RSA of NCDSB's "desire and intent to withdraw [its] request for arbitration." AR at 585.

### III. Procedural History

On September 28, 2000, plaintiff Jones filed a complaint with regard to the disputed procurement seeking declaratory and injunctive relief in the United States District Court for the Eastern District of North Carolina. Mr. Jones also moved for a temporary restraining order and a preliminary injunction which would have precluded the government from awarding the contract without applying the Randolph–Sheppard Act and would have lasted until either an arbitration panel convened pursuant to the Randolph–Sheppard Act or the district court determined that the Act did not apply to the Fort Bragg food services contract. Mr. Jones further requested a declaratory judgment that the Randolph–Sheppard Act was applicable to the Fort Bragg solicitation. The district court granted NCDSB's motion to intervene in the case.

Defendants Secretary of Defense and Secretary of the Army moved to dismiss plaintiff Jones' complaint or in the alternative for summary judgment and opposed plaintiff Jones' motion for a preliminary injunction. On March 14, 2001, the district court issued an opinion denying defendants' motion to dismiss or for summary judgment and plaintiff's motion for a preliminary injunction. The district court denied plaintiff's motion for a preliminary injunction because it held that Mr. Jones did not establish a likelihood of success on the merits of the case. The district court determined that "plaintiff has failed to meet its burden that Army's decision not to apply the RSA priorities was arbitrary and capricious, and the Army has proffered rational reasons why the RSA did not apply to the 'umbrella contract' at issue in the present case." AR at 600.

On April 12, 2001, Mr. Warfel of the Army's contracting office, sent a letter to the RSA in response to DOE's correspondence authorizing an arbitration panel to issue a decision on whether the Randolph–Sheppard Act applied to the Fort Bragg food services contract. The letter stated that since NCDSB was pursuing its action in the district court, it would be inappropriate for the parties to also seek resolution through an arbitration panel although having an arbitration panel hear and decide the issue would be the preferred method of settling the parties' dispute. To that end, Mr. Warfel suggested

that NCDSB voluntarily dismiss its action in district court.

On August 8, 2001, Mr. DeLuca sent a letter to Commissioner JoAnn Wilson of DOE's Offices of Special Education and Rehabilitation Services noting that the RSA had granted NCDSB's request that "arbitration be held in abeyance as the result of an active court case dealing with the same issue" and notifying the RSA of NCDSB's "desire and intent to withdraw [its] request for arbitration." AR at 585. However, on August 21, 2001, the district court filed the parties' stipulation to dismiss their district court action, without prejudice.

On September 5, 2001, NCDSB sent a letter to the Commissioner of the RSA addressing several issues arising from the Fort Bragg solicitation, including whether the Army could refuse to apply the Randolph–Sheppard Act to its full food services and dining facility attendant services solicitation without requesting approval from RSA. NCDSB also requested that the Commissioner provide a statement from the RSA opining that the Army could not refuse to apply the Randolph–Sheppard Act to its food services solicitation.

In response to NCDSB's September 5, 2001 letter, on November 6, 2001, the Commissioner sent a letter to NCDSB noting that RSA has "consistently interpreted section 107d–3(3) of the Act as covering full service operations on military bases including military troop dining facilities" and that the "recent court of appeals decisions in *NISH Goodwill Services Inc. v. Cohen,* 247 F.3d 197 (4th Cir.2001) provides unqualified support of the application of the Act to military dining facilities." AR at 4237–38. The letter further stated, in relevant part, that: (1) "[i]f a Federal agency believes that it is inappropriate to apply the priority to a full food service contract, it may seek a limitation pursuant to 20 U.S.C. 107(b)" and that the agency must justify its determination to the Secretary in order for it to be approved; (2) it is unnecessary to determine whether the Act would apply "[i]f Fort Bragg had issued a separate procurement containing only the 34 dining facilities attendant services cafeterias," because "the procurement at issue con-

tains full food service cafeterias as well and, thus, the cafeteria priority clearly applies to the procurement;" and (3) "[b]ased upon the foregoing, there is no basis to maintain that the procurement is not covered by the priority because it includes only dining facility attendant services at 34 cafeterias." AR at 4238.

Although the RSA's letter was issued on November 6, 2001, it was not forwarded to the Army until after contract award. On January 8, 2002, Karen S. Rainville, contracting officer, responded to NCDSB's December 12, 2001 letter which enclosed the RSA's November 6, 2001 letter and requested that "Fort Bragg either negotiate directly with the Division of Services for the Blind, or conduct another solicitation in accordance with the RSA." Pl. Exh. 6. Ms. Rainville stated that since that contract had been awarded in December 2001, the Army was not in a position to either negotiate with or conduct another solicitation. The letter further stated that the Army's decision not to apply the Randolph–Sheppard Act to the Fort Bragg solicitation was consistent with Army policy and federal law and approved by the Army's higher command.

On March 19, 2002, plaintiffs filed a complaint in this court, objecting to the Army's award of the full food service contract to KCA Corporation and to the proposed award option years under the contract. Plaintiffs allege that the Army ignored the Randolph–Sheppard Act's priority to blind vendors and hence, violated the Randolph–Sheppard Act and its implementing regulations. Plaintiffs seek declaratory and injunctive relief declaring the Randolph–Sheppard Act applicable to the disputed contract; permanently enjoining the Army from exercising any options under the present contract and requiring defendant to solicit a new contract which applies the Randolph–Sheppard Act and the Act's priority for blind vendors in the Army's selection of the operator for cafeterias at Fort Bragg.

Cross-motions for summary judgment on the administrative record have been filed and are currently pending. Oral argument was held on May 7, 2002.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(b)(1) and may grant plaintiffs appropriate relief, "including declaratory and injunctive relief," if this court finds in their favor. *Id.* § 1491(b)(2).

## DISCUSSION

### I. Standards of Review

#### A. Cross-motions for Summary Judgment

In deciding cross-motions for summary judgment upon the administrative record pursuant to Rule 56.1 of the Rules of the Court of Federal Claims (RCFC), this court treats the motions the same as a motion for summary judgment under RCFC 56.[9] *Chas. H. Tompkins Co. v. United States,* 43 Fed.Cl. 716, 719 (1999) (citing *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997)). Summary judgment is properly granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). A fact is material if it may affect the outcome of the suit under the substantive law governing the action. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. All doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus,* 812 F.2d at 1390. However, the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Such evidence need not be admissible at

trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; and *Mingus,* 812 F.2d at 1390–91.

When the court is presented with cross-motions for summary judgment, each motion must be evaluated on its own merits, under the summary judgment standards set forth above, and the court is not required to find summary judgment for either party simply because cross-motions were filed. *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997) (citations omitted). Nevertheless, this court has found that "[a] motion for summary judgment upon the administrative record, or for summary judgment, is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are matters of contractual and regulatory interpretation." *Id.; Tompkins,* 43 Fed.Cl. at 719.

#### B. Scope of Review

Defendant has submitted the administrative record in this matter, including all matters before the contracting officer and documents agreed upon by the parties. Plaintiffs, in their cross-motion for summary judgment on the administrative record and response to defendant's and intervenor's motions for summary judgment on the administrative record have submitted several "extra-record" exhibits. Defendant and intervenor oppose the filing of such documentation, claiming that the affidavits proffered by plaintiffs are "post-hoc rationalizations" and unsuitable for review by this court as the material is outside of the administrative record.

 The court's review of matters based upon the administrative record, such as bid protests, is generally confined to "the administrative record already in existence, not

---

9. Plaintiffs have filed a motion for summary judgment pursuant to RCFC 56 rather than a cross-motion for summary judgment on the administrative record pursuant to Rule 56.1 as directed by the court. At oral argument, the court addressed this matter and at plaintiffs' request, the court deems plaintiffs' motion before this court as having been filed pursuant to RCFC 56.1 and will review the motion accordingly.

some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). *See Marine Hydraulics Int'l, Inc. v. United States,* 43 Fed.Cl. 664, 670 (1999). However, there are certain limited instances where a court may allow the parties to supplement the administrative record to "preserve a meaningful judicial review." *Rust Constructors Inc. v. United States,* 49 Fed.Cl. 490, 496 (2001) (quoting *SDS Int'l v. United States,* 48 Fed.Cl. 759, 766 (2001) and *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997)). This court has consistently considered the following factors set forth in *Esch v. Yeutter,* 876 F.2d 976 (D.C.Cir.1989), in making its "extra-record" evidence determination:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Myers Investigative and Sec. Servs., Inc. v. United States,* 47 Fed.Cl. 288, 294 (2000) (quoting *Cubic,* 37 Fed.Cl. at 342 (quoting *Esch,* 876 F.2d at 991)). *See also Marine Hydraulics,* 43 Fed.Cl. at 670; *Pikes Peak Family Hous., LLC v. United States,* 40 Fed.Cl. 673, 677 (1998); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 156 (1997); and *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 779 (1997).

Plaintiffs have submitted the following "extra-record" materials: (1) affidavit of Clarence E. Mitchell, chairman and chief executive officer of Mitchco; (2) an order from the District Court for the Western District of Oklahoma in *State of Oklahoma, ex. rel., Oklahoma Dep't of Rehabilitation Servs. v.* *United States,* No. CIV–96–1734–A which held that 20 U.S.C. § 107d–1(b) does not require a complainant to exhaust administrative remedies; (3) affidavit of John DeLuca, executive director of NCDSB; (4) affidavit of Tim Jones; (5) Report of the Committee on Labor and Public Welfare regarding the Randolph–Sheppard Act Amendments of 1974; (6) the Department of Justice (federal appellee) brief in *NISH and Goodwill Servs., Inc. v. Cohen and Randolph–Sheppard Vendors of Am., et. al.,* No. 00–1632; (7) the United States' brief in *Automated Communication Systems, Inc. d/b/a ACSI v. United States,* No. 01–65C; and (8) a letter dated January 8, 2002 from Karen S. Rainville, contracting officer at Fort Bragg, to Mr. DeLuca of NCDSB regarding the letter from the Commissioner of RSA stating that the Randolph–Sheppard Act applied to the Fort Bragg solicitation.

▬▬▬ The court will allow the affidavits filed by plaintiffs. Mr. Mitchell's affidavit is relevant and would assist in the judicial review of this matter because it sheds light on information contained in the administrative record, but not adequately explained elsewhere. In particular, Mr. Mitchell's affidavit describes the nature of the relationship between Mitchco and NCDSB and the reasoning behind the identical proposals submitted by Mitchco and NCDSB for the Fort Bragg contract. Likewise, Mr. DeLuca's affidavit offers information not contained in the administrative record. The affidavit states that NCDSB would not have qualified under the small business set-aside guidelines. This is an issue relevant to this matter, but not fully elucidated in the administrative record. Mr. Jones' affidavit enables this court to understand issues concerning the meaning of the term "cafeteria" in the Randolph–Sheppard Act and the various duties performed by those vendors operating cafeterias. The court will also allow the contracting officer's January 8, 2002 letter to NCDSB as this letter contains an explanation of agency action that is not contained in the administrative record. The letter indicates when the Army received the Commissioner's letter concerning the Randolph–Sheppard Act's applicability to the Fort Bragg solicitation and why the Army did not apply the Act despite

the Commissioner's opinion. As there has been no objection to the filing of the legislative history of the Act, the court will also allow the filing of this history. The history would only aid in the review of this matter.

The court will not permit the filing of the district court's order in *State of Oklahoma* or the United States' briefs in *NISH v. Cohen* or *ACSI v. United States*. The district court's order will not aid in the court's review of this matter since the order is not detailed and the issue of exhaustion and its applicability to the Act has been addressed in several court opinions. The United States' briefs in the cited cases are also not relevant to this matter. Those briefs set forth the government's stance on the issues before those courts and do not add to this court's understanding of the matter inasmuch as this court has the administrative record, the relevant statutes, regulations, and legislative history, as well as case law to rely upon in making a decision.

In light of the above, the court will consider for review all matters included in the administrative record as well as the aforementioned affidavits, legislative history, and the contracting officer's January 8, 2002 letter.

## C. Review of Record in Bid Protest Cases

This court has jurisdiction over this bid protest pursuant to the Administrative Dispute Resolution Act (ADRA) of 1996, Pub.L. No. 104–320 § 12, 110 Stat. 3870, 3874–75 (1996) (amending the Tucker Act, 28 U.S.C. § 1491(b)), which grants the court:

> jurisdiction to render judgment on an action by an interested party objecting to the solicitation by a Federal Agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States

shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.[10]

Under the standard of review applicable in bid protests, an agency's procurement decision will be upheld unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). In determining whether an agency's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, the court must ascertain whether " 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.' " *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001) (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994)). The " 'disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.' " *Id.* (internal quotations omitted). In undertaking its analysis, the court is not to substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States*, 41 Fed.Cl. 66, 83 (1998). The court recognizes that the agency possesses wide discretion in the application of procurement regulations. *See Impresa*, 238 F.3d at 1333. *See also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (stating that " '[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations' " (citation omitted)). Nevertheless, the court, as required by the APA, must conduct a " 'thorough, probing, in-depth review' of the agency's action to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Antarctic Support As-*

---

10. Congress included a sunset provision in the ADRA which terminated federal district court jurisdiction over bid protests on January 1, 2001. Pub.L. No. 104–320, § 12(d), 110 Stat. at 3875.

*See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (2001) (discussing the ADRA's sunset provision).

*socs. v. United States,* 46 Fed.Cl. 145, 154 (2000), *aff'd,* 251 F.3d 171 (Fed.Cir.2000) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

■ Moreover, "[a] protestor must prove the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation by a preponderance of the evidence." *T & S Products, Inc. v. United States,* 48 Fed.Cl. 100, 104 (2000) (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir. 1988); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999); *R.R. Donnelley & Sons, Co. v. United States,* 38 Fed. Cl. 518, 521–22 (1997); *PCI/RCI v. United States,* 36 Fed.Cl. 761, 767 (1996)). In addition, the violation of a statute or regulation must be clear and prejudicial. *Beta Analytics Int'l, Inc. v. United States,* 44 Fed.Cl. 131, 136 (1999) (citing *Central Ark. Maint., Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995) (citation omitted)). However, to establish prejudicial error, although a protestor must demonstrate that the error in the procurement process was "significant", the protestor is not required to show that but for the agency's alleged error, it would have been awarded the contract. Instead, the protestor need only show that, had it not been for the alleged error in the procurement process, " 'there was a substantial chance it would have received the contract award.' " *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581–82 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996); citing *CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed. Cir.1983)).

### D. Injunction Standard

■ If a plaintiff demonstrates that a procurement was unlawful, the issue then before the court is whether to grant permanent injunctive relief. To gain a permanent injunction, a plaintiff must establish: (1) actual success on the merits; (2) that it will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the government and third parties; and (4) that granting the injunction serves the public interest. *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000) (citations omitted); *Ellsworth,* 45 Fed.Cl. at 393 (citation omitted). To establish that preliminary injunctive relief is necessary, a plaintiff must only demonstrate "a likelihood of success on the merits" as opposed to actual success on the merits, in addition to the other three factors required for a court to grant a permanent injunction. *Delbert Wheeler Const., Inc. v. United States,* 39 Fed.Cl. 239, 251 (1997), *aff'd,* 155 F.3d 566 (Fed.Cir.1998) (Table) (citations omitted).

## II. Merits

Defendant and intervenor first argue that both Mr. Jones and NCDSB lack standing under this court's bid protest jurisdiction pursuant to the Tucker Act and therefore may not pursue a remedy in this court. The government maintains that Mr. Jones lacks standing because he is not an "interested party" under the Tucker Act inasmuch as he is not a bidder or offeror and the remedial scheme of the Randolph–Sheppard Act does not grant blind vendors any substantive entitlement to a remedy. With regard to NCDSB, defendant and intervenor contend that NCDSB lacks standing due to a key point—even if the government had made a clear error, NCDSB would not have had a substantial chance of receiving the challenged contract award as the Army found NCDSB to be outside of the competitive range and the Randolph–Sheppard Act regulations concerning cafeterias on federal property only give priority to blind vendors who are in the competitive range. As a result, NCDSB would not have a "direct economic interest" because it had no substantial chance of receiving the challenged award; therefore, NCDSB cannot have standing under the Tucker Act.

In rejoinder, plaintiffs claim that both are interested parties because they are bidders whose direct economic interests would be affected by either the award of or failure to award the contract. Plaintiffs argue that there is a substantial chance that NCDSB

would have received the award had the Army applied the Randolph–Sheppard Act priority to the Fort Bragg solicitation when the Army first decided to issue the full food services and dining facility attendant services solicitation. Therefore, NCDSB would have standing because it would have had a direct economic interest. Plaintiffs further assert that the award of the contract to NCDSB would have yielded a financial benefit not only to Mr. Jones but also to other blind vendors licensed with NCDSB, giving Mr. Jones, in particular, standing as well.

For this court to have jurisdiction over plaintiffs, plaintiffs must have standing. *Myers Investigative and Security Svcs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir.2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). " 'The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].' " *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). The court, in addressing standing, must also determine whether prejudice or injury occurred since prejudice is an element of the standing requirement. *See Myers*, 275 F.3d at 1370.

As stated previously, section 1491(b) of the Tucker Act grants this court jurisdiction to entertain pre-award and post-award bid protest actions brought by "an interested party objecting to the solicitation by a Federal Agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract . . ." The Federal Circuit has recently addressed the issue of standing and the meaning of the term "interested party" in the bid protest context. In *American Federation of Government Employees, AFL–CIO v. United States*, 258 F.3d 1294 (Fed.Cir.2001), the Federal Circuit held that the term "interested party" in section 1491(b) is to be construed in accordance with the Competition in Contracting Act (CICA), 31 U.S.C. §§ 3551–56. *American Federation*, 258 F.3d at 1302. Accordingly, the term "interested party" is limited to " 'an actual or prospective bidder or offeror whose direct

economic interest would be affected by the award of the contract or by failure to award the contract.' " *Id.* (quoting 31 U.S.C. § 3551(2)). The Federal Circuit, in *Myers Investigative and Security Services, Inc. v. United States*, 275 F.3d 1366 (Fed.Cir.2002), has not only acknowledged the standard set forth in *American Federation* but has also further illuminated the issue of standing by determining that the "substantial chance rule continues to apply." *Myers*, 275 F.3d at 1370. That is, the holding issued by the Federal Circuit in several cases that "a potential bidder must establish that it had a substantial chance of securing the award in order to establish standing" remained in place after *American Federation* since the opinions addressing the "substantial chance" rule did not reach the issue of whether the Administrative Procedure Act (APA) or CICA standing standards applied to the Tucker Act. *Id.* (citing *Impresa*, 238 F.3d at 1330; *Alfa Laval*, 175 F.3d at 1367; and *Statistica, Inc.*, 102 F.3d 1577 as addressing the "substantial chance" rule).

Although, as noted, *supra*, the protestor "must show a significant, prejudicial error in the procurement process," *Alfa Laval*, 175 F.3d at 1367, the protestor is not required to demonstrate that " 'but for the alleged error, the protestor would have been awarded the contract,' [r]ather, the protestor must show 'that there was a substantial chance it would have received the contract but for that error." *Id.* (citing *Statistica*, 102 F.3d at 1581–82; *Data Gen. Corp.*, 78 F.3d at 1562; *CACI, Inc.–Fed.*, 719 F.2d at 1574–75). With regard to defining the term "substantial chance," the protestor must demonstrate that " 'it was within the zone of active consideration." ' *Alfa Laval*, 175 F.3d at 1367 (quoting *CACI*, 719 F.2d at 1574–75). The Federal Circuit has found that a protestor did not have a substantial chance, and thus lacked a direct economic interest in such instances as when the contractor did not submit a proposal; the bidder withdrew from the procurement; and the bidder was rated below second in the evaluation process. *See Impresa*, 238 F.3d at 1334 (citing *MCI Telecommunications Corp. v. United States*, 878 F.2d 362 (Fed.Cir.1989); *Fed. Data Corp. v. United*

States, 911 F.2d 699 (Fed.Cir.1990); *United States v. Int'l Bus. Machines Corp.*, 892 F.2d 1006, 1010–12 (Fed.Cir.1989)). Concomitantly, the Federal Circuit has determined that where a protestor demonstrates that but for the alleged error it had a substantial chance of receiving the challenged award, the protestor has shown a direct economic interest and will be deemed to have standing. *Id.*

### A. Plaintiff Jones lacks standing since he was not an actual or prospective bidder or offeror.

▇▇▇ As stated, the term "interested party" with regard to this court's bid protest jurisdiction under the Tucker Act is limited to "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *American Federation*, 258 F.3d at 1302 (internal quotations and citation omitted). As defendant advances, Mr. Jones is not an actual or prospective bidder or offeror.

The administrative record demonstrates that plaintiff Jones was neither an actual nor a prospective offeror. NCDSB, not Mr. Jones, submitted a proposal for the Fort Bragg full food and dining facility attendant services contract. Plaintiffs' counsel further elucidated this matter in oral argument. In explaining the nature of the relationship between the SLA and a blind vendor, plaintiffs' counsel stated that Mr. Jones does not bid for the contract; rather, NCDSB submits a proposal. In fact, Mr. Jones' counsel acknowledged that Mr. Jones, as the blind licensee, would be the contract manager, one of the people identified by NCDSB "in positions of importance in the contract," Tr. 59:5–7[11], but certainly not a bidder or offeror.

Given the fact that Mr. Jones was not the actual or prospective offeror in this matter, this court finds that Mr. Jones does not have standing to challenge the Army's decision to award the Fort Bragg food services contract without applying the Randolph–Sheppard Act. *See Impresa*, 238 F.3d at 1334 (finding that appellants, potentially displaced federal employees who would be affected by the federal agencies' decision, and their unions did not have standing to challenge the agencies' award decision because they were not actual or prospective bidders or offerors). *But cf. Randolph–Sheppard Vendors of Am., et al. v. Weinberger*, 795 F.2d 90, 254 U.S.App.D.C. 45, 54–55 (D.C.Cir.1986) (finding, in an action challenging the award of government contracts pursuant to the Randolph–Sheppard Act, that "[b]ecause blind vendors would have standing to sue in their own right, those organizations with blind vendors as members have standing as their representatives to contest the contract awards").[12] Accordingly, without standing, this court does not have jurisdiction over plaintiff Jones' claims against defendant.

### B. NCDSB lacks standing because NCDSB does not show that it had either a "direct economic interest" or that it has been prejudiced.

Defendant and intervenor contend that NCDSB lacks standing because it is not an "interested party" in accordance with the Tucker Act's bid protest jurisdiction inasmuch as NCDSB cannot show that it would have been in a position to receive the challenged award since it was not in the competitive range as required to apply the Randolph–Sheppard Act priority. Consequently, intervenor explains, NCDSB cannot show that it was prejudiced by the Army's decision

---

**11.** "Tr. _:_" refers to the numbered pages and lines of the transcript of the oral argument held on May 7, 2002.

**12.** At oral argument, plaintiffs argued that because Mr. Jones was a licensee with NCDSB and the Act was written to benefit blind vendors licensed by state licensing agencies, Mr. Jones has standing. Plaintiffs further explain that Mr. Jones is also the party in interest because he is the individual who would take over the contract and receive the benefits of the contract. As a result, plaintiffs conclude, Mr. Jones is a third-party beneficiary and thus has standing in this court. Plaintiffs, however, did not present any case law in support of this contention. Indeed, this court is unable to find case law supporting plaintiffs' third-party beneficiary argument in the bid protest context. Consequently, the court finds that plaintiffs' third-party beneficiary argument is without merit and will not be further addressed by this court.

not to apply the Randolph–Sheppard Act to the Fort Bragg solicitation.

In opposition, plaintiff NCDSB argues that it is an "interested party" because had the Army acted in accordance with the law at the outset and applied the Act, NCDSB would have had a substantial chance of receiving the award and thus, a demonstrated direct economic interest which would be affected by the award of or failure to award the contract. NCDSB advances several arguments in support of this contention. NCDSB maintains that it was prejudiced by the Army's decision not to apply the Randolph–Sheppard Act when the Army: (1) did not initially invite NCDSB to submit a proposal for the Fort Bragg solicitation in accordance with 34 C.F.R. § 395.33; (2) effectively precluded NCDSB from responding to the solicitation by informing NCDSB that it would not apply the Act's priority but would instead issue the solicitation as a small business set-aside; and (3) informed NCDSB that any of its clients could submit solicitation proposals only eight days before the proposal due date, giving NCDSB only eight days to prepare a proposal. NCDSB also suggests, in support of its "substantial chance" argument, that although it was not within the Army's competitive range, NCDSB was within the definition of competitive range contemplated by DOE in the original drafting of the Randolph–Sheppard Act regulations. Therefore, because NCDSB contends that it was within this definition of competitive range, it had a substantial chance of receiving the award. NCDSB further submits that even under the Army's definition of competitive range it would have had a substantial chance of receiving the challenged award had it been allowed sufficient time for the preparation of its proposal.

### 1. NCDSB was not in the competitive range and its claim challenging the terms of the solicitation is untimely.

Under the Randolph–Sheppard Act, cafeterias are included in the term "vending facility." 20 U.S.C. § 107e(7). The DOE regulation implementing the Randolph–Sheppard Act and concerning cafeterias on federal property, 34 C.F.R. § 395.33, states, in rele-

vant part, that blind vendors shall be given priority to operate cafeterias on federal property and ". . . [i]f the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section. . . ." Section 260.3(g) of the DOD regulations concerning the implementation of the Randolph–Sheppard Act and involving cafeterias on DOD property essentially echoes the DOE regulations on the subject. Particularly relevant to this action are the DOD regulations which state, among other things, that: (1) blind vendors are given priority to operate cafeterias "when the cafeteria operation involved is contracted;" (2) if the SLA submits a proposal and the proposal is not in the competitive range, DOD may award the contract to another offeror, under certain conditions; and (3) if the SLA submits a proposal that is within the competitive range, DOD will award the contract to the SLA except as provided in 260.3(g)(1)(iii). 32 C.F.R. § 260.3(g).

In the instant case, upon receiving NCDSB's timely submitted proposal for the Fort Bragg solicitation and evaluating NCDSB's proposal in accordance with the solicitation evaluation plan, the contracting officer sent a letter to NCDSB explaining that its proposal had been determined to be outside of the competitive range. The letter informing NCDSB that it was outside of the competitive range noted the material deficiencies within NCDSB's proposal and stated that due to those material deficiencies, NCDSB's "proposal did not have a reasonable chance of being selected for award." AR at 4283. NCDSB does not substantively challenge the contracting officer's competitive range determination. Instead, NCDSB argues that the Army did not act in accordance with the law when it failed to apply the Randolph–Sheppard Act to the Fort Bragg solicitation and that it would have been in the competitive range if it had been allowed more time for bid preparation.

First, contrary to NCDSB's assertions, the issue of whether the Randolph–Sheppard Act applied to the solicitation is not dispositive of the matter and, in fact, need not be reached in order to resolve this action. This is so because NCDSB's argument that the Army committed error by not applying the Act must fail since plaintiff has not demonstrated that any such error was a material error which prejudiced plaintiff. Plaintiff, here, has not demonstrated that had it not been for the Army's error in failing to apply the Act, NCDSB would have had a substantial chance to receive award of the contract and that it was therefore prejudiced by the Army's failure to apply the Act.

As noted above, the DOE regulations require an SLA's proposal to be within the competitive range or have a reasonable chance of being selected for final award before applying the priority set forth under section 395.33(a). NCDSB was not within the competitive range. In fact, NCDSB's offer was rated second to last, not high enough in rank to be included in the competitive range. The contracting officer determined, after a thorough evaluation, that NCDSB's proposal did not have a reasonable chance of being selected, and provided a detailed, coherent and reasonable explanation for the competitive range determination. *See Impresa,* 238 F.3d at 1332 (stating "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.") (internal quotations omitted). NCDSB does not directly challenge the contracting officer's competitive range determination, but instead, asserts that it would have been within the competitive range had it been allowed adequate time to prepare its proposal.

NCDSB argues that it was handicapped because it was given insufficient time to prepare its proposal since the Army had precluded NCDSB from submitting a proposal earlier than eight days prior to the proposal due date. There is, however, no evidence in the administrative record that supports this contention. NCDSB asserts that while the Army did not specifically state that it could not submit a proposal, by determining that the solicitation would be issued as a small

business set-aside, the Army, in effect, precluded NCDSB, which is not a small business, from submitting a proposal. NCDSB states that it did not submit a proposal until the Army specifically informed it that any of NCDSB's clients could submit a proposal under the terms of the solicitation. As a result, NCDSB's hurriedly prepared proposal was ranked second to last and excluded from the competitive range.

Nothing in the administrative record supports NCDSB's argument. Instead, the administrative record as well as counsels' statements during the oral argument demonstrate that the Army issued the solicitation as a small business set-aside but at no time actually told NCDSB that it was prohibited from submitting a proposal. In fact, all of the correspondence between the parties during this period concerned the applicability of the Randolph–Sheppard Act to the solicitation, not whether NCDSB was allowed to submit a proposal under a solicitation issued as a small business set-aside.

By letter dated May 11, 2000, the Army informed NCDSB for the second time that it had determined the procurement was not covered by the Randolph Sheppard Act. At that point, NCDSB had two choices. First, NCDSB could have sought a declaratory judgment or injunctive relief from the appropriate tribunal with regard to its claim that the Randolph–Sheppard Act applied to the Fort Bragg solicitation. Second, NCDSB could have chosen to prepare a proposal immediately, regardless of whether the Army applied the Randolph–Sheppard Act to the solicitation. Had NCDSB chosen to prepare and submit a proposal, there would have been no last minute rush and plaintiff would have had ample opportunity to properly prepare its proposal by the original submission deadline of July 12, 2000. By preparing and submitting its proposal in a timely fashion, NCDSB would have also been in a position to timely challenge any rejection of that proposal by the agency, irrespective of whether the basis of the Army's rejection was founded on an argument that NCDSB was not a small business or that the Act did not apply.

 In the instant case, the Army ultimately chose to permit a state licensing

agency to submit a proposal under a small business set-aside procurement. Of course, at the outset, NCDSB had no way of knowing whether the Army would have permitted it, an entity which was obviously not a small business, to submit a proposal. However, the only method by which NCDSB could find out whether its proposal would be accepted (either under the rules governing small business set-asides or under the application of the Randolph Sheppard Act) was to submit a proposal and then challenge any rejection of that proposal *prior* to the deadline for receipt of all proposals or at the very least, *prior* to contract award. The court reaches this determination by virtue of the analogy of this case to the line of cases where this court, in appropriate circumstances, has adopted the General Accounting Office (GAO) bid protest rule that protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of proposals. *See Aerolease Long Beach v. United States*, 31 Fed.Cl. 342, 358, *aff'd*, 39 F.3d 1198 (1994) (declining to accept the GAO bid protest regulations as controlling all cases concerning the timeliness of an objection to solicitation terms, but accepting the "utility of the GAO rule in the bid protest arena") (citing *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 789 (1991) ("finding favor with the timeliness regulations of the GAO for bid protests")). *See also MVM, Inc. v. United States*, 46 Fed.Cl. 126, 130 (2000) (citing *Allied Tech. Group, Inc. v. United States*, 39 Fed.Cl. 125, 145 (1997), *aff'd*, 173 F.3d 435 (Fed.Cir.1998) (Table) and *Aerolease*, 31 Fed. Cl. at 358 for the proposition that "challenges to the facial terms of the solicitation [are] to be made before the award of the contract. If the protestor waits until after the award, the protestor *may* be considered to have waived this challenge"). In a similar vein to those cases, the court in this case holds that where an offeror recognizes a significant deficiency or problem in a solicitation (*e.g.,* the errone-

ous application of a particular statute/regulation to the solicitation), the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion, *i.e.,* prior to the closing date for receipt of proposals or, at the latest, prior to contract award.

█ If the Army had rejected plaintiff's timely submitted proposal for any reason, including the fact that NCDSB was not a small business or that the Randolph–Sheppard Act did not apply to permit plaintiff to submit a proposal, the appropriate time for NCDSB to have challenged the Army was prior to July 20, 2000, the final deadline for the submission of proposals or, at the very latest, prior to November 30, 2001, the date of contract award. NCDSB could not wait to see whether or not it won the contract before challenging perceived problems with the solicitation. Acceptance of such a practice would be disruptive, unfair to the other offerors and would serve to undermine the soundness of the federal procurement system. *See Pardee Constr. Co.*, B–256,414, 94–1 CPD ¶ 372, *4 (June 13, 1994) (unpublished) (stating that the GAO's "timeliness rules reflect the dual requirements of giving parties a fair opportunity to present their cases and resolving protests expeditiously without unduly disrupting or delaying the procurement process") (citing *Industrial Acoustics Co., Inc.— Recon.*, B–246,260.2, 92–1 CPD ¶ 120 (Jan. 28, 1992)); *Ervin and Assocs., Inc.*, B–279,-083, B–279,219, 98–1 CPD ¶ 126, *7 (Apr. 30, 1998) (unpublished) ("[t]o prevent those [timeliness] rules from becoming meaningless, exceptions are strictly construed and rarely used").[13] Accordingly, where an offeror declines to raise an objection and obtain a determination on the matter, the court may find that the offeror has waived its right to protest. *See Aerolease*, 31 Fed.Cl. at 358. The court finds that NCDSB was untimely in

---

**13.** While these decisions are not binding on this court, this court accords deference to the Comptroller General decisions in recognition of GAO's expertise and role in the resolution of contested procurement decisions. *Bean Dredging Corp. v.*

*United States*, 22 Cl.Ct. 519, 522 (1991) (citing *Honeywell, Inc. v. United States*, 870 F.2d 644, 647–48 (Fed.Cir.1989); *Howell Constr., Inc. v. United States*, 12 Cl.Ct. 450, 452 (1987)).

its objections in this case and has waived its rights in that regard.[14]

Moreover, the court finds that even if it were to take into account the "exception" to GAO's timeliness rule in the instant case, the court would still find NCDSB's claim to be untimely. GAO, notwithstanding a protestor's untimely filing, does apply an exception to its timeliness rule under certain circumstances such as for "good cause" or if the protest presents an issue which is significant to the procurement process. *See* JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS at 1505 (3d ed.1998). *See also Sinclair Radio Labs., Inc.,* B–227,-474, B–227,474.2, 87–2 CPD ¶ 470, **67 (Nov. 10, 1987) (acknowledging the protestor's argument pursuant to the significant issue exception of our Bid Protest Regulations, 4 C.F.R. § 21.2); *Ervin and Assocs., Inc.,* 98–1 CPD ¶ 126 at *7 (noting the significant issue exception to the GAO's timeliness rules). However, such an exception should not be entertained in this case because not only did NCDSB not protest this matter prior to the submission of proposals, but NCDSB also, with full knowledge of its claimed challenge to the solicitation's terms, elected to compete under the terms of this solicitation. *See Ervin and Assocs., Inc.,* B–279,083, B–279,-219, 98–1 CPD ¶ 126 (unpublished) (Apr. 30, 1998) (stating that the protestor's allegation was clearly untimely in an instance where not only was the error apparent on the face of the solicitation and the protestor filed its protest untimely, the protestor also elected to compete under the allegedly defective solicitation). Given that NCDSB was fully aware of its alleged challenge to the Fort Bragg solicitation, and yet chose to participate in procurement notwithstanding the solicitation error, the court cannot stray from its determination that NCDSB had ample opportunity to pursue its claim concerning the terms of the solicitation and possible preclusion from the submission of its proposal.

### 2. NCDSB fails to show that the Act's regulations contemplate a definition of competitive range different from that utilized in the solicitation.

NCDSB presents no support for its secondary argument that the competitive range definition utilized by the Army in this procurement was required to be the same as that contemplated during DOE's drafting of the Randolph–Sheppard Act regulations. NCDSB urges that the term "competitive range", as originally referenced in the Act's regulations, is broader than the term used in the Army's procurement. It asserts that under the term, as used at the time the Randolph–Sheppard Act regulations were adopted, " 'a proposal must be regarded as being in the competitive range unless it is so deficient or out of line in price as to preclude further meaningful negotiations.' " Pl. Reply at 8 (citing *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718 (1987)). NCDSB then contrasts this earlier description of the competitive range with that later promulgated by the federal government during the late 1990's, which changed the parameters of a competitive range determination to be far more restrictive.

In NCDSB's repeated assertions that the Army changed its definition of competitive range to raise the bar higher for competing proposals, plaintiff fails to make it clear that such a change was instituted throughout the federal government and not restricted to just the Army or the Department of Defense. The historical basis for this change is set forth succinctly by government contract authors, Nash and Cibinic, as follows:

... [M]any agencies were including a large number of offerors in the competitive range, with the result that they were unable to conduct meaningful negotiations

---

**14.** It is appropriate to note again at this juncture that on September 28, 2000, Mr. Jones and NCDSB did file a request with the district court for injunctive relief to preclude the government from awarding the contract without applying the Randolph–Sheppard Act and for a declaratory judgment that the Randolph–Sheppard Act was applicable to the solicitation. While plaintiffs' request for injunctive relief was denied by the district court, no final disposition was reached on the merits of the case because the parties voluntarily dismissed the action. It does not further NCDSB's suit in this court that NCDSB, having successfully brought suit before the district court, abandoned its case there prior to a full and final determination on the matter.

with these offerors. This practice also increased the costs of the competition by requiring many competitors to continue to participate in the process when only one would be awarded a contract .... These negative effects of broad inclusion of offerors in the competitive range were recognized as detrimental to the competitive negotiation process; and, in 1995, Congress was requested to amend the procurement statutes to permit more limited competitive range determinations.

JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS at 869 (3d ed.1998).

Plaintiff also makes the erroneous assertion that the Army, in the disputed procurement, used a "best value" standard to determine the competitive range. This contention, however, is belied by the terms of the procurement. The solicitation provision to which NCDSB cites as the basis for its assertion, "Determination of Competitive Range", sets forth a summary of the evaluation results for each of the twelve offerors and provides, in pertinent part: "After a thorough and complete evaluation of the twelve proposals submitted, it is necessary to conduct discussions in order to obtain the best value for the Government." AR at 534. The provision's reference to "best value" relates not to the establishment of a competitive range, but rather to the basis for award of the contract. The court's conclusion in this regard is further buttressed by the solicitation's "Instructions To Offerors", which states in paragraph (f): "Contract award. (1) The Government intends to award a contract or contracts resulting from this solicitation to the responsible offeror(s) whose proposal(s) represents the best value after evaluation in accordance with the factors and subfactors in the solicitation." AR at 119.

There is no precedent to support plaintiff's argument that the Randolph–Sheppard Act regulations require the application of a competitive range definition that is different from that typically used in federal procurement law today. FAR § 15.306(c)(1) states that "[b]ased on the ratings of each proposal against all criteria, the contracting officer

shall establish a competitive range comprised of all of the most highly rated proposals, unless the range is further reduced for purposes of efficiency pursuant to paragraph (c)(2) of this section." The administrative record in this case reflects that the contracting officer here followed FAR § 15.306. The competitive range established was comprised of all of the most highly rated proposals. Of the twelve proposals submitted, four were determined to be within the competitive range. NCDSB's proposal was not one of those included within the competitive range since its proposal was evaluated and ranked as second-to-last, tied with Mitchco International.

Paragraph (f)(4) of the procurement's Instructions to Bidders continues to track the FAR's guidance with respect to establishment of the competitive range. FAR § 15.306(c)(2) states, in pertinent part: "Provided the solicitation notifies offerors that the competitive range can be limited for purposes of efficiency ... the contracting officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals." In accordance with the cited FAR provision, the Army's solicitation, in its Instructions to Bidders, similarly provides: "... the Contracting Officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals." AR 119.

The Army's solicitation in the instant case has been demonstrated to follow the FAR's provisions on the establishment of the competitive range. Aside from its bald assertion, NCDSB presents no authority supporting its contention that the Randolph–Sheppard Act contemplates or requires a definition of competitive range different from that currently set forth in the Federal Acquisition Regulations and used by the Army in the Fort Bragg solicitation. Accordingly, the court concludes that NCDSB's argument in that regard is fatally flawed.

█ In light of the above, this court determines that NCDSB lacks standing in this matter. NCDSB's argument that the Army

applied an erroneous definition of the competitive range is wholly without merit since the Fort Bragg solicitation followed the FAR's provisions concerning the competitive range determination. Furthermore, the administrative record demonstrates that NCDSB was not precluded by the Army from preparing its submission in a considered and timely fashion before the proposal due date. Instead, the record shows that NCDSB could have prepared and submitted its proposal earlier and if such proposal had been rejected by the Army, NCDSB could have filed a timely protest prior to the submission of proposals or at least prior to contract award. Given these findings, the court determines that even if the Randolph–Sheppard Act applied to the Fort Bragg solicitation, NCDSB would not have had a substantial chance of receiving the contract award insofar as NCDSB was not within the competitive range as required for the Randolph–Sheppard Act priority to be applicable and was not precluded from such inclusion. Therefore, NCDSB has failed to demonstrate that there has been a significant prejudicial error in the procurement process. By not showing that it would have had a substantial chance of receiving the challenged award and that there was a significant prejudicial error, NCDSB lacks a direct economic interest in the award of the contract and thus, also lacks standing.[15]

## CONCLUSION

For the above-stated reasons, it is **ORDERED** that:

(1) Plaintiffs' Motion for Summary Judgment on the Administrative Record, including all of its requests for injunctive and declaratory relief, is **DENIED.** Defendant's and Intervenor's Cross–Motions for Summary Judgment on the Administrative Record are **GRANTED**;

(2) The Clerk is directed to enter final judgment dismissing the complaint in this action;

(3) On or before, **July 8, 2002,** counsel for each party shall file with the Clerk's Office a redacted copy of this opinion, with any material deemed proprietary marked out in brackets, so that a copy of the Opinion can then be prepared and made available in the public record of this matter; and

(4) Each party must bear its own costs.

15. Since the court has found that plaintiffs lack standing, the court finds it unnecessary to address defendant's and intervenor's arguments concerning whether plaintiffs, pursuant to the Act, are required to exhaust their administrative remedies before pursuing an action in this court.