**WASHINGTON STATE DEPARTMENT OF SERVICES FOR the BLIND and Robert Ott, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 03–2017 C.**

United States Court of Federal Claims.

Dec. 17, 2003.

Catherine R. Hoover, Olympia, WA, for plaintiff Washington State Department of Services for the Blind. Andrew D. Freeman, Baltimore, MD, for plaintiff Robert Ott.

Cristina C. Ashworth, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Donald E. Kinner, Assistant Director, Civil Division, Department of Justice, Washington, DC, for defendant. J. Mackey Ives, Army Litigation Division, Arlington, VA, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

Before the court is Plaintiffs' Motion for Referral of Issues and Preliminary Injunction (Pls.' Mot.), the accompanying memorandum in support (Pls.' Mem.), and the responsive briefing thereto.[1]

## I. Background

The Washington State Department of Services for the Blind (DSB) learned in January 2003 that the current contract to operate the dining facilities at Fort Lewis, Washington would end in September 2003.[2] Pl.'s Mem. at 1. By letter dated January 21, 2003, DSB informed the Army that it was interested in exercising its statutory priority under the Randolph–Sheppard Act (RSA) to operate the dining facilities at Fort Lewis. Pls.' Mem. Ex. 1. DSB claims that the Army refused to apply RSA on the ground that the contract was not for full food services but for dining facilities attendant services. Pls.'s Mem. at 3. "Under a dining facilities attendant contract, military personnel cook the food in a mess hall, but an outside contractor provides other services, such as washing dishes." Pls.' Mem. at 3 n. 1.

On July 16, 2003, the Army issued a pre-solicitation notice for a "Dining Facility Attendants and Full Food Services" contract to be awarded as a section 8(a) set aside under the Small Business Administration Act. Pls.' Mem. Ex. 2. Neither DSB nor Robert Ott, the licensed vendor in Washington's vending program under RSA selected to operate the dining facilities at Fort Lewis if the DSB obtains the contract, is eligible to bid on a section 8(a) contract. Pls.' Mem. at 3; Complaint (Compl.) ¶ 5.

After the issuance of the pre-solicitation notice, DSB sought an opinion from the Rehabilitation Services Administration of the United States Department of Education (DOE) concerning the applicability of RSA to the Army contract at Fort Lewis. Pls.' Mem. at 3. As the federal agency authorized to interpret RSA, see 20 U.S.C. §§ 107(b), 107d–3(e), DOE issued an opinion in August 2003 that RSA did apply to the Fort Lewis contract. Pls.' Mem. Ex. 3.

Based on the Army's refusal to withdraw its pre-solicitation notice notwithstanding the DOE's August 2003 opinion, DSB and Robert Ott[3] filed this action on August 29, 2003, seeking a temporary restraining order and preliminary injunction requiring the Army to apply RSA to the Fort Lewis contract. After several informal telephonic status conferences and with the concurrence of the parties, the court stayed the proceedings in this case pending the Army's issuance of a re-

1. The responsive briefing includes: Defendant's Opposition to Plaintiffs['] Motion for Referral of Issues and Preliminary Injunction (Def.'s Opp.); Reply in Support of Plaintiffs' Motion for Referral of Issues and Preliminary Injunction (Pls.' Reply); and Defendant's Surreply to Plaintiffs['] Motion for Referral of Issues and Preliminary Injunction (Def.'s Surreply).

2. At oral argument, defendant stated that the expiring contract was awarded as a section 8(a) set-aside under the Small Business Administration Act. Transcript of Oral Argument on December 12, 2003 (Oral Arg. Tr.) at 93. The Army had not applied the Randolph–Sheppard Act priority. Id.

3. While Mr. Ott, a blind vendor, is named as a plaintiff in the complaint, the parties are currently briefing the issue of the proper party status, if any, for Mr. Ott in this case. See Order dated December 2, 2003. Cf. N.C. Div. of Servs. for the Blind v. United States, 53 Fed.Cl. 147, 162 (2002).

vised pre-solicitation memorandum and solicitation. *See* Order dated October 22, 2003.

The Army then withdrew its pre-solicitation notice and divided its food services contract at Fort Lewis into two separate contracts, one for dining facility attendant (DFA) services and one for full food services (FFS).[4] Pls.' Mem. at 4; Def.'s Opp. at 2–4. *See also* http://www.lewis.army.mil/doc/SOL-IC.htm. The solicitation for dining facilities attendant (DFA) services issued on November 10, 2003 is in issue in this protest. Pls.' Mot. at 1; Def.'s Opp. at 3. The solicitation seeks proposals pursuant to section 8(a) of the Small Business Administration Act, 15 U.S.C. § 637. Def.'s Opp. at 3. Bids were due on December 12, 2003.[5] Pls.' Mot. at 1.

The solicitation seeks offers for the provision of DFA services at approximately eight Fort Lewis military dining facilities for a one-year period with four one-year option periods. Def.'s Opp. at 3. The estimated value of the DFA solicitation, including the four option years, is $16 million. *Id.*

The Performance Work Statement of the DFA solicitation describes the DFA services to be performed under a contract award. Pls.' Mem. Ex. 4 at TE–2–1. Among the services to be provided are: (1) "[p]repare, maintain and clean dining areas," (2) "[c]lean tableware," (3) "[c]lean spills and remove soiled dinnerware occasionally left by diners," (4) "[c]lean dining room tables, chairs, booths, walls, baseboards, window . . . ledges, doors/doorframes, ceiling fans, . . . light fixtures, . . . drapes/curtains and Venetian blinds," (5) "[r]emove and replace[ ] tablecloths when stained or heavily soiled," (6) "[c]lean all non-food contact surfaces," (7) "[c]lean and sanitize all food contact surfaces, including dinnerware, utensils, and trays," (8) "[c]lean floors and floor coverings in all areas," (9) "[w]ax and buff floors," (10) "[d]iscard garbage," and (11) "[c]lean restrooms." *Id.* at TE–2–10, TE–2–11.

DSB filed Plaintiffs' Motion for Referral of Issues and Preliminary Injunction on December 1, 2003 asking this court to refer the issue of whether RSA applies to the solicitation, pursuant to the primary jurisdiction doctrine, to DOE for an opinion. Pls.' Mot. at 1. Alternatively, DSB requests that this court determine whether RSA applies to the solicitation. *Id.* DSB seeks a preliminary injunction pursuant to Rule 65 of the Court of Federal Claims to enjoin the Army from accepting bids for the contract until 60 days after the issuance of the agency's or the court's opinion. *Id.* Noting the time-sensitivity of this matter, DSB states that, unless a decision by the court is issued at least five days before the bid due date, DSB's blind vendor, Mr. Ott, will lose his teaming partner, Cantu Services, Inc., with whom DSB would like to submit its bid. Transcript of Telephonic Status Conference on December 8, 2003 (TSC Tr. 12/8/03) at 6; *see also* Pls.' Mem. Ex. 10 (including Declaration of Gary Burks ¶¶ 2, 9–14). Bids are now due on December 23, 2003.

Further to extended telephonic status conferences, additional briefing, the creation of an agreed exhibit list, oral argument, and the designation by the United States of an Administrative Record,[6] the court has consid-

---

4. The FFS solicitation issued on November 13, 2003 with bids due on December 22, 2003. Def.'s Opp. at 4. *This solicitation seeks bids for the operation of a military dining facility for a one-year period with four one-year option periods. Id.* The estimated value of the FFS solicitation, including the four option years, is $12.51 million. *Id.* The contracting officer has determined that the Randolph–Sheppard Act does apply to this solicitation. *Id.*

5. To facilitate the resolution of this matter, the Army extended the deadline for offers to December 23, 2003. *See* Defendant's Status Report filed December 9, 2003.

6. At the request of the court, the government designated an Administrative Record filed on December 17, 2003. *See* Rules of the Court of Federal Claims (RCFC) Appendix C ¶¶ 21–23. Because of the compressed time period within which it assembled the record and the impending retirement of Mary King, the Contracting Officer, the government advised plaintiffs and the court at a telephonic status on December 16, 2003 that there could possibly be other documents of which government counsel was not aware. Transcript of Telephonic Status Conference on December 16, 2003 (TSC Tr. 12/16/03) at 19. Also before the court is a Joint Exhibit List filed December 15, 2003, which was supplemented by Plaintiffs' Exhibits 13 and 14, filed on December 15, 2003. *See* Order dated December 15, 2003. *The parties stipulated to the authenticity of the items on the Joint Exhibit List, as supplemented. Oral Arg. Tr. 12/16/03 at 10–11.

ered this motion on an expedited briefing schedule. For the following reasons, plaintiffs' motion is DENIED.

## II. Discussion

### A. Bid Protest Jurisdiction

This action is a pre-award bid protest alleging the violation of an applicable procurement statute. Pls.' Reply at 10; TSC Tr. 12/8/03 at 12. This court has jurisdiction pursuant to the Administrative Dispute Resolution Act (ADRA) of 1996, Pub.L. No. 104–320 § 12, 110 Stat. 3870, 3874–75 (1996) (amending the Tucker Act, 28 U.S.C. § 1491(b)), which grants the court "jurisdiction to render judgment on an action by an interested party objecting to the solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b). Under *American Federation of Government Employees, AFL–CIO v. United States*, 258 F.3d 1294 (Fed.Cir.2001) (*AFGE* ), this court is to construe the term "interested party" in section 1491(b) in accordance with the Competition in Contracting Act (CICA), 31 U.S.C. §§ 3551–56 (2000). *AFGE*, 258 F.3d at 1302.

Accordingly, the term "interested party" is limited to " 'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.' " *Id.* (quoting 31 U.S.C. § 3551(2)). In order to establish a direct economic interest, "a potential bidder must establish that it had a substantial chance of securing the award in order to establish standing." *Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed.Cir.2002) (*Myers* ).

■ Under the standard of review applicable in bid protests, an agency's procurement decision will be upheld unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). The court recognizes that the agency possesses wide discretion in the application of procurement regulations. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed.Cir.2001). *See also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (stating that " '[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and

After discussion at the December 16, 2003 telephonic status conference, the court advised the parties that it would regard the following items on the Joint Exhibit List as directly relevant to the history of the disputed DFA procurement, although not designated as part of the Administrative Record:

(1) Letter to James N. Edwards, Dir. of Contracting Services for the Blind, from Jeanne M. Gallo, Dept. of Services for the Blind, dated January 21, 2003. Plaintiffs' Motion for Temporary Restraining Order filed August 29, 2003, Exhibit 2; Plaintiffs' Motion for Referral of Issues, filed December 2, 2003, Exhibit 1.

(2) Letter to Jeanne M. Gallo, Dept. of Services for the Blind, from James N. Edwards, Dir. of Contracting, Army Contracting Agency, dated February 5, 2003. Plaintiffs' Motion for Temporary Restraining Order filed August 29, 2003, Exhibit 7.

(3) Letter to James N. Edwards, Dir. of Contracting Services for the Blind, from Jeanne M. Gallo, Dept. of Services for the Blind, dated March 7, 2003. Plaintiffs' Motion for Temporary Restraining Order filed August 29, 2003, Exhibit 3.

(4) Letter to James N. Edwards, Dir. of Contracting Services for the Blind, from Catherine R. Hoover, Assistant AG, dated May 23, 2003. Plaintiffs' Motion for Temporary Restraining Order filed August 29, 2003, Exhibit 4.

(5) Letter to James N. Edwards, Dir. of Contracting Services for the Blind, from Jeanne M. Gallo, Dept. of Services for the Blind, dated June 16, 2003. Plaintiffs' Motion for Temporary Restraining Order filed August 29, 2003, Exhibit 5.

(6) Letter to Jeanne M. Gallo, Dept. of Services for the Blind, from James N. Edwards, Dir. of Contracting, Army Contracting Agency, dated July 3, 2003. Plaintiffs' Motion for Temporary Restraining Order filed August 29, 2003, Exhibit 6.

(7) Letter to Andrew D. Freeman from Joanne M. Wilson, Commissioner, RSA, dated August 11, 2003. Plaintiffs' Motion for Temporary Restraining Order filed August 29, 2003, Exhibit 9; Plaintiffs' Motion for Referral of Issues, filed December 2, 2003, Exhibit 13.

TSC Tr. 12/16/03 at 21–38.

application of the procurement regulations'") (citation omitted). In undertaking its analysis, the court is not to substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States*, 41 Fed.Cl. 66, 83 (1998). A protester must show that an agency's actions were without a reasonable basis or violated an applicable procurement statute or regulation. *Info. Tech. & Applications Corp. v. United States*, 51 Fed.Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed.Cir.2003).

In this case, DSB can readily be shown to have a "direct economic interest," *AFGE*, 258 F.3d at 1302, such that it is an interested party with standing under 28 U.S.C. 1491(b), *Myers*, 275 F.3d at 1370. If the DFA solicitation should properly be viewed as a solicitation for the operation of a cafeteria subject to RSA, DSB would be afforded a priority and would not only have a "substantial chance" of receiving the contract award, *Myers*, 275 F.3d at 1370, but would be the likely recipient of the contract award.

The court turns first to address DSB's request for referral of this action pursuant to the primary jurisdiction doctrine.

### B. The Primary Jurisdiction Doctrine

DSB urges the court to apply the primary jurisdiction doctrine to permit DOE to determine whether RSA applies to the DFA solicitation. Pls.' Mem. at 6–7. The doctrine of primary jurisdiction is described by the Supreme Court as follows:

> Primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending

referral of such issues to the administrative body for its views.

*United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (internal quotation omitted). The Supreme Court further observed that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction." *Id.* at 64, 77 S.Ct. 161. In determining whether to refer a case to an administrative agency, however, courts have conducted a four-factor analysis: (1) whether the question at issue falls within the agency's particular discretion; (2) whether the question at issue is within the conventional expertise of judges or whether it involves technical or policy considerations within the agency's field of expertise; (3) whether a danger of inconsistent rulings exists; and (4) whether a prior application to the agency has been made. *See Phone–Tel Communications, Inc. v. AT & T Corp.*, 100 F.Supp.2d 313, 316 n. 3 (E.D.Pa.2000).

With respect to the factor-that the determination is within agency discretion, DSB argues that because Congress "has specifically delegated implementation and interpretation" of RSA to DOE, Pls.' Mem. at 6 (citing 20 U.S.C. §§ 107(b), 107a(a), and 107d–3(e)), and because DOE "has determined that all contracts 'pertaining to the operation of cafeterias' are subject to the priority," *id.* (citing 34 C.F.R. § 395.33(c)), DOE should decide the legal question presented here: "whether and to what extent dining facilities services other than cooking food pertain to operating a cafeteria," *id.* Plaintiff asserts that the issue in this case lies "squarely within [DOE's] area of competence." *Id.*

While acknowledging that "[r]egulations and general policy pronouncements by the Commissioner of [DOE's Rehabilitative Services Administration] interpreting regulations should be accorded *Chevron* deference," [7] Def.'s Opp. at 14, defendant argues

---

7. *Chevron* deference is afforded to an agency's interpretation of a particular statutory provision "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121

S.Ct. 2164, 150 L.Ed.2d 292 (2001) (*Mead*) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (*Chevron*)). Evidence of such authority may be shown by an agency's power to engage in notice-and-comment rulemaking or formal adjudication. *See id.* at 230, 121 S.Ct. 2164. *See also Chevron*, 467 U.S. at

that no statutory or regulatory basis exists for DOE to issue advisory opinions concerning the applicability of RSA, *id.* at 13. Defendant states, however, that "[i]f a bidder believes that [a] contracting officer's actions are contrary to the [RSA], it can file a bid protest with this Court under the bid protest statute or request arbitration before [DOE]." *Id.* at 10.[8] Defendant contends that a combination of procurement regulations, specifically, the FAR, Army regulations, and DOE's regulations pursuant to RSA, govern a contract for the operation of dining facility. Def.'s Opp. at 8. Defendant argues that "[u]ltimately, the decision regarding whether [RSA] applies to a particular procurement is made by the contracting officer for the procuring agency." *Id.* (citing 48 C.F.R. §§ 1.601, 1.602–1 (2002)). Defendant relies on several recent court decisions in support of its position that the contracting officer is authorized to make the decision whether or not RSA applies to a procurement. *Id.* at 8–10 (citing *NISH v. Cohen,* 95 F.Supp.2d 497, 499 (E.D.Va.2000), *aff'd,* 247 F.3d 197 (4th Cir.2001); *Automated Communications Sys., Inc. v. United States,* 49 Fed.Cl. 570, 578 (2001); *NISH v. Rumsfeld,* 348 F.3d 1263, 1271 (10th Cir.2003)).

Defendant also argues that referral to DOE is inappropriate in this case because the interpretation of the term "operation of a vending facility" is a legal issue of statutory construction that "falls squarely within the jurisdiction of this court" and renders the primary jurisdiction doctrine inapplicable. *Id.* at 16–17 (quoting *Commonwealth Edison Co. v. United States,* 56 Fed.Cl. 652, 668 (2003)). Defendant further argues that the question of statutory interpretation presented here does not require the type of highly technical or specialized understanding militating in favor of referral to an administrative agency required in the cases of *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 66–67, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (in which the Supreme Court concluded that "[w]hether steel casings filled with napalm gel are incendiary bombs is, in this context, more than simply a question of reading the tariff language or applying abstract 'rules' of construction"), *Far E. Conference v. United States,* 342 U.S. 570, 573–574, 72 S.Ct. 492, 96 L.Ed. 576 (1952) (in which the Supreme Court states that "[w]hether a given agreement among [maritime shipping] carriers should be held to contravene the [Shipping] [A]ct may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect of the shipping of foreign countries, and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade; and with which that body, consequently, is better able to deal") (internal quotation omitted), and *Phone–Tel*

843–44, 104 S.Ct. 2778. An agency interpretation meriting *Chevron* deference is reviewed under the Administrative Procedure Act standard, 5 U.S.C. § 706, requiring an agency's findings to upheld unless the interpretation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). *Mead,* 533 U.S. at 227, 121 S.Ct. 2164. For agency "interpretations [similar to those] contained in policy statements, agency manuals, and enforcement guidelines," however, the Supreme Court has stated that courts may treat the agency's guidance as persuasive evidence. *Mead,* 533 U.S. at 234–35, 121 S.Ct. 2164. Contrary to some of the views expressed in briefing, the DOE opinion letters on which the parties' rely as general policy pronouncements addressing the proper interpretation of the term "operation of a cafeteria" under the RSA and its implementing regulations do not merit *Chevron* deference but may be afforded *Mead* deference and weighed as persuasive evidence.

8. The parties have not challenged this court's jurisdiction to hear DSB's complaint notwithstanding RSA's provision of the administrative remedy of arbitration. The court believes that it has jurisdiction of this case under the Federal Circuit's decision in *Texas State Commission for the Blind v. United States,* 796 F.2d 400, 404 (Fed.Cir.1986) (en banc) (*TSCB* ). The court notes, however, that the issue of jurisdiction was not a focus of the Federal Circuit's opinion in *TSCB. Id.* at 405 n. 8. In some other cases which have turned on the question of exhaustion of administrative remedies under the RSA, courts have found exhaustion to be required. *See, e.g., Randolph–Sheppard Vendors of Am. v. Weinberger,* 795 F.2d 90, 100–111 (D.C.Cir.1986); *Fillinger v. Cleveland Soc'y for the Blind,* 587 F.2d 336, 338 (6th Cir.1978).

*Communications, Inc. v. AT & T Corp.*, 100 F.Supp.2d 313, 321 (E.D.Pa.2000) (in which the district court referred an issue to the Federal Communications Commission after determining that "to divine a definition of a 'completed' call without an informed appreciation of the technology needed to implement it in the first place would be an empty gesture").[9] DSB does not contest that the determination to be made is within not only the jurisdiction but also "within the conventional expertise" of the court. Oral Arg. Tr. at 29.

As to the danger of inconsistent rulings, a referral to DOE would not appear to offer a solution. As is discussed below, even final agency decisions of DOE arbitration panels on the applicability of RSA to DFA contracts are in apparent conflict, a circumstance consistent with DOE's current determination that the applicability of RSA to DFA contracts be approached on a "case-by-case" basis.

There is no pending request to DOE for guidance as to the DFA solicitation at issue here. DSB sought and received DOE's opinion on an earlier proposed procurement prior to filing suit. Pls.' Mem. at 9. The Commissioner did issue an opinion responding to an inquiry concerning whether the now withdrawn Fort Lewis procurement triggered the priority under the Randolph–Sheppard Act. Pls.' Mem. Ex. 3. DSB argues that they "should not be deprived of the opportunity [to seek DOE's opinion] because of the Army's belated attempt to remove the DFA contract from the ambit of [RSA] and [DOE's] original opinion in this case" by splitting the contract into two parts. Pls.' Mem. at 9–10.

Based on the foregoing considerations, *see Phone–Tel Communications*, 100 F.Supp.2d at 316 n. 3, the court determines that the question of whether the term "operation of a vending facility" requires the application of RSA to a DFA services contract is a matter of statutory interpretation that falls within the conventional expertise of this court. *Id.* The court DENIES plaintiff's motion for referral and turns to DSB's request for injunctive relief.

## C. Preliminary Injunctive Relief

### 1. Standard

This court's equitable jurisdiction may be invoked only in "extraordinary circumstances." *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 393 (1984). A plaintiff bears a "heavy burden" in requesting injunctive relief, *Howell Constr., Inc. v. United States*, 12 Cl.Ct. 450, 452 (1987); *IMS Servs., Inc. v. Untied States*, 33 Fed.Cl. 167, 177 (1995), and must demonstrate its right to such relief by "clear and convincing evidence," *Bean Dredging Corp. v. United States*, 22 Cl.Ct. 519, 522 (1991).

The Federal Circuit has stated that a party is entitled to a preliminary injunction if: (1) the party has a likelihood of success on the merits; (2) the party will be irreparably harmed without injunctive relief; (3) the balance of hardships favors the petitioning party; and (4) the public interest favors the grant of injunctive relief. *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed.Cir. 2003).

A plaintiff must show a "reasonable probability" of success on the merits to justify a preliminary injunction. *Bannum, Inc. v. United States*, 56 Fed.Cl. 453, 457 (2003). Establishing the likelihood of success on the merits by itself is not determinative. *Id.* Rather, the likelihood of success and irreparable harm factors must be weighed in relation to each other. *Id.* (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 2948.3, 2951 (1995)). A plaintiff must

---

9. Moreover, defendant stated during the telephonic status conference held in this matter on December 8, 2003, that having "consult[ed] with the Department of Education extensively" regarding the position taken in its briefing, arbitration "is the only process that was outlined by Congress and that was outlined by the Department of Education available to a state licensing agency when they are unhappy with a procurement." TSC Tr. 12/8/03 at 43. Defendant added that "[t]here is no provision to go to the Department of Education for an [advisory] opinion." *Id.* at 46. Due to perceived "inadequacies of the remedies in the arbitration process" and because DSB believes that the arbitration process is discretionary rather than mandatory, DSB has not pursued arbitration to resolve the issue before the court. TSC Tr. 12/8/03 at 37–38.

show that absent a preliminary injunction, it will suffer irreparable harm before a decision can be rendered on the merits. *Id.* at 456.

### 2. Likelihood of Success on the Merits

The legal issue in this case is whether the Army's refusal to apply the Randolph–Sheppard Act's priority to the DFA solicitation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). This determination turns on a question of statutory and regulatory interpretation, specifically, whether the DFA services described in the DFA solicitation constitute the "operation of a cafeteria" and thereby compel the application of RSA to the solicitation.

#### a. The Text of the Statute and Implementing Regulations

As the Supreme Court stated in *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999), "in any case of statutory construction, [the court's] analysis begins with the language of the statute[ ][a]nd where the statutory language provides a clear answer, it ends there as well." *Id.* at 438, 119 S.Ct. 755 (citation and internal quotation marks omitted). In accordance with the rules of statutory interpretation, courts consider the "plain meaning" of the statutory language. *See* 2A Norman J. Singer, *Statutes and Statutory Construction* (*Singer*) § 46:01 (6th ed.2000) (discussing the plain meaning rule).

Deciding a question of statutory interpretation certified by the Claims Court in an action filed by the Texas State Commission for the Blind to enforce an arbitration award, the Federal Circuit stated in *Texas State Commission for the Blind v. United States:*

In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." Of course, there is no errorless test for identifying or recognizing "plain" or "unambiguous" language. Also, authoritative administrative constructions should be given the deference to which they are entitled, absurd results are to be avoided and internal inconsistencies in the statute must be dealt with.

796 F.2d 400, 406 (1986) (quoting *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (citations omitted)). Accordingly, the court begins its analysis in this case by looking to the language of RSA and implementing regulations.

Section 107(a) of RSA states that "blind persons licensed under the provisions of this chapter shall be authorized *to operate vending facilities* on any Federal property." 20 U.S.C. § 107(a) (emphasis added). Section 107(b) of RSA provides that "[i]n authorizing the *operation of vending facilities* on Federal property, priority shall be given to blind persons licensed by a State agency . . . ." 20 U.S.C. § 107(b) (emphasis added). RSA defines the term "vending facility" to include "cafeterias." 20 U.S.C. § 107e(7). RSA authorizes the Secretary of Education, acting through the Commissioner of the Rehabilitation Services Administration (Commissioner), to "prescribe regulations *to establish a priority for the operation of cafeterias* on Federal property by blind licensees when he determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided . . . ." 20 U.S.C. § 107d–3(e) (emphasis added).

The implementing regulations promulgated by the Secretary are set forth at 34 C.F.R. §§ 395.1–395.38 (2002). Section 395.33 of the regulations, which addresses the operation of cafeterias by blind vendors and is the focus of the parties' arguments regarding statutory interpretation, provides:

(a) Priority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract

or otherwise. Such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible.

(b) In order to establish the ability of blind vendors to operate a cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of cafeteria services, the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated by appropriate property managing department, agency, or instrumentality. Such solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices. If the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section. If the State licensing agency is dissatisfied with an action taken relative to its proposal, it may file a complaint with the Secretary under the provisions of § 395.37.

(c) All contracts or other existing arrangements pertaining to the operation of cafeterias on Federal property not covered by contract with, or by permits issued to, State licensing agencies shall be renegotiated subsequent to the effective date of this part on or before the expiration of such contracts or other arrangements pursuant to the provisions of this section.

(d) Notwithstanding the requirements of paragraphs (a) and (b) of this section, Federal property managing departments, agencies, and instrumentalities may afford priority in the operation of cafeterias by blind vendors on Federal property through direct negotiations with State licensing agencies whenever such department, agency, or instrumentality determines, on an individual basis, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees: Provided, however, that the provisions of paragraphs (a) and (b) of this section shall apply in the event that the negotiations authorized by this paragraph do not result in a contract.

34 C.F.R. § 395.33.

The parties' and the court's efforts to draw definitive guidance from the most obviously relevant terms in the statute, *e.g.*, "blind persons ... shall be authorized *to operate vending facilities*," 20 U.S.C. § 107(a) (emphasis added), and "[DOE is authorized to] prescribe regulations to establish a priority for the *operation of cafeterias*," *id.* § 107d–3(e) (emphasis added), yield quite unsatisfactory results.[10] In the absence of a statutory or regulatory definition of the terms "operate" and "operation," the court, as have the parties, looks to the dictionary to establish the plain meaning of the term. *See Hebah v. United States*, 197 Ct.Cl. 729, 456 F.2d 696, 704 (1972) (stating that "[t]o establish the common or plain meaning of a word or term, this court has long accepted dictionary definitions").

"To operate" is used in 20 U.S.C. § 107(a) as a transitive verb ("to operate vending facilities"). When used as a transitive verb, "to operate" has distinctive meanings: "1. To control the functioning of; run ... 2. To conduct the affairs of; manage ...." *The American Heritage Dictionary of the English Language* 1233 (4th ed.2000). The phrase "to operate vending facilities" in 20 U.S.C. § 107(a) therefore connotes a distinctly executive function. Defendant finds the phrase supportive of its position. Defendant

---

**10.** The terms "operate" and "operation" are undefined in RSA and the regulations. *See* 20 U.S.C. § 107e (defining terms used in RSA); 34 C.F.R. § 395.1 (defining terms used in the regulations). Nor are they modified by any qualifying or limiting phrases or words. *See id.* § 107(a) ("[licensed] blind persons ... authorized to operate vending facilities"); *id.* § 107(b) ("[i]n authorizing the operation of vending facilities ... priority ... given to blind persons"); *id.* § 107d–3(e) ("[DOE Commissioner] ... to establish a priority for the operation of cafeterias on Federal property").

states that the plain meaning of the term operate is " 'to cause to function,' " Def.'s Surreply at 2 (quoting *Merriam–Webster's Collegiate Dictionary* 813 (10th ed.2002)), and that "[t]he function of a cafeteria is to serve food," *id.* Defendant argues that the general rule under the implementing regulation addressing the operation of cafeterias by blind vendors is "that blind vendors are given a priority for the operation of a cafeteria if they can provide food at a reasonable cost and quality." Def.'s Opp. at 12 (citing 34 C.F.R. 395.33(a)). Noting that the DFA contractor serves an auxiliary role by providing janitorial services, such as cleaning the tables, floors, and bathrooms of the cafeteria, defendant argues that "discrete services, such as cleaning [do] not rise to the level of 'operating' [a] cafeteria" under RSA. *Id.* at 24.

The term "operation," appearing in both 20 U.S.C. §§ 107(a), (b) and 34 C.F.R. § 395.33, however, is far more protean and malleable. The term "operation" is defined in the *American Heritage Dictionary* as the "act or process of operating or functioning," "[t]he state of being operative or functional," "[a] process or series of acts involved in a particular form of work," and "[a]n instance or method of efficient, productive activity." *The American Heritage Dictionary of the English Language* 1233 (4th ed.2000). Relying on the definition of the term "operation" contained in *Webster's Encyclopedic Unabridged Dictionary of the English Language,* Pls.' Ex. 14, DSB asserts that the DFA services sought in the solicitation qualify as "an instance ... of functioning or operating." Oral Arg. Tr. at 47; Pls.' Ex. 14 at 2. DSB argues that the implementing regulations under RSA "mandate a priority for blind vendors 'in the operation of cafeterias,' require that the state licensing agency for the blind ('SLA') be invited to respond to solicitations for any 'cafeteria contract,' and require that all contracts or other arrangements 'pertaining to the operation of cafeterias' come under [RSA]'s auspices." Pls.' Reply at 2 (quoting 34 C.F.R. §§ 395.33(a), (b), (c)). DSB contends that the Secretary's intention broadly to construe the term "operation" and thereby broadly to construe the applicability of RSA is evidenced by the language in each of the subsections of regulatory provision 34 C.F.R. § 395.33. *See* Oral Arg. Tr. at 13–16.

DSB relies most heavily on the language in 34 C.F.R. § 395.33(c) "requir[ing] all contracts 'pertaining to the operation of cafeterias' on federal property to be renegotiated pursuant to the Randolph–Sheppard Act." Pls.' Reply at 3 (quoting 34 C.F.R. § 395.33(c)). DSB asserts that the "plain language of section 395.33(c) applies to 'all contracts ... pertaining to the operation of cafeterias on Federal property,' without any limitation based on when the contract expires." *Id.* DSB argues that "[t]he scope of contracts required to be renegotiated under [RSA] is identical to the scope of contracts to which [RSA] applies." *Id.*

However, the full text of the regulatory provision on which DSB relies for its argument that RSA applies to " '[a]ll contracts ... *pertaining to* the operation of cafeterias on Federal property,' " Pls.' Mem. at 4 (emphasis added), states:

> All contracts or other *existing* arrangements pertaining to the operation of cafeterias on Federal property not covered by contract with, or by permits issued to, State licensing agencies *shall be renegotiated subsequent to the effective date of this part* on or before the expiration of such contracts or other arrangements pursuant to the provisions of this section.

34 C.F.R. § 395.33(c) (emphasis added). The requirement to renegotiate "subsequent to the effective date" of the regulatory provision "all ... existing arrangements" for the "operation of cafeterias ... not covered by" RSA indicates that subsection (c) of 34 C.F.R. § 395.33 is a transitional provision intended to assist in the implementation of RSA rather than to mandate the application of RSA to all contracts relating in any way to the operation of cafeterias on federal property, as DSB urges. In further support of the court's view that the "pertaining to" phrase relates only to the coverage of the transition to RSA, the court notes that subsections (a), (b) and (d) of 34 C.F.R. § 395.33 contain cross-references between and among each other, but contain no cross-references to subsection (c) of 34 C.F.R. § 395.33.

DSB contends that other evidence of the Secretary's intention to construe the term "operation" broadly is found in the sentence of 34 C.F.R. § 395.33(a), "[s]uch operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible." Oral Arg. Tr. at 14–16 (quoting 34 C.F.R. § 395.33(a)). Defendant's refusal to apply RSA's priority to the DFA solicitation, DSB argues, "contradicts" the express terms of the regulation by minimizing the employment opportunities for blind vendors in connection with the operation of cafeterias at Fort Lewis. Pls.' Reply at 7 ("To allow a federal property manager to remove the majority of a cafeteria contract from the Act's priority ... would contradict the Act's ... intent to maximize entrepreneurial opportunities for blind vendors.").

The court agrees that the regulatory language in 34 C.F.R. § 395.33(a) indicates that the priority afforded by RSA in the operation of a cafeteria by blind vendors anticipates the maximization of the work opportunities for blind vendors. Both RSA and the implementing regulations put some limitation on the priority to be afforded blind vendors, however, in particular that the priority only be afforded upon a determination that "such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided." 20 U.S.C. § 107d–3(e); 34 C.F.R. § 395.33(a).

In response to defendant's position that an operator of a cafeteria must provide the food, DSB asserts that "[i]t is the cafeteria, ... not the blind vendor personally, that must provide the food." Id. at 9 (citing 34 C.F.R. § 395.33(a)). DSB explains that the "[h]igh-quality-food-at-a-reasonable-price limitation was included in [RSA] to address concerns

from certain federal employees that blind vendors would use their priority to obtain dining facilities and then use their power to charge unreasonably high prices." Id. (citing S.Rep. No. 93–937, at 24 (1974)).

The court construes the language "operation ... provided ... with food" to leave open the question of whether, to bring the operation of a cafeteria under RSA, an operator of a cafeteria must personally provide the food or whether it is sufficient that high quality food is provided on the premises, even if not by the operator directly. The court is not persuaded that the language compels either the restrictive interpretation urged by defendant—that blind vendors are afforded a priority for the operation of a cafeteria only if they can provide food at a reasonable cost and high quality, see Def.'s Opp. at 24–25; Def.'s Surreply at 2, or the restrictive interpretation urged by plaintiffs—that no food need be provided by the RSA operator provided the contract pertains in some way to cafeteria operations. See Pls.' Reply at 7–9.[11]

DSB also contends that RSA "is not limited to contracts to 'manage' a cafeteria" but applies to any cafeteria contract. Id. at 8. DSB urges that the DFA contractor at Fort Lewis must "manage all aspects of the services which it is engaged to provide," id., and that more than one operator of a contract is permissible, id. at 9. DSB notes that, under the permit scheme for vending facilities, "[b]lind vendor operators are responsible for 'cleaning necessary for sanitation' in their vending facilities and for installation, maintenance, and repair of any machines." See Pls.' Reply at 8 (citing 34 C.F.R. § 395.35(c)(2)). DSB argues that

---

11. DSB also points to the "expan[sive]" language in the first sentence of 34 C.F.R. § 395.33(b), Pls.' Reply at 7; Oral Arg. Tr. at 14–15, which states:

In order to establish the ability of blind vendors to operate a cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of cafeteria services, the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality.

Id. DSB argues that, to describe the manner of operating a cafeteria, this regulatory provision uses "expansive" references in the phrases "provide food service," "providers of cafeteria services," and "cafeteria contract." Oral Arg. Tr. at 15. The court understands the purpose of this language to be administrative guidance regarding the role of the state licensing agencies, rather than an aid to interpretation of the language "operation of cafeterias," 34 C.F.R. § 395.33(a), or "to operate vending facilities," 20 U.S.C. § 107(a).

analogous requirements must apply for the parallel circumstance under a contract for the "operation" of a cafeteria. *Id.* at 7–8. This argument ignores, of course, the executive connotation of the phrase "to operate vending facilities" in 20 U.S.C. § 170(a).

Subsection (b) of 34 C.F.R. § 395.33, which requires that a state licensing agency "be invited to respond to solicitations for offers when a cafeteria contract is contemplated" so that "the ability of blind vendors to operate a cafeteria" may be established, 34 C.F.R. § 395.33(b), also indicates what tasks might comprise the "operation" of a cafeteria. This regulatory provision requires the establishment of criteria in solicitations for offers "to operate a cafeteria." *Id.* The provision sets forth a non-exclusive list of criteria that may be included in the solicitation to judge the responses of offerors, including "sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices." *Id.* It is not clear from the text whether the regulation contemplates one contract that includes all of the listed tasks or whether it contemplates multiple contracts for the various tasks listed.

The DFA solicitation in this case defines DFA service as "[t]hose activities which comprise janitorial and custodial functions within a dining facility including, but not limited to, sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning and related quality control." Pls.' Mem. Ex. 4 at § 2.2.7. The tasks, which are in fact part of the "process of operating or functioning" a cafeteria and do constitute "[a] process or series of acts involved in a particular form of work," fall within the plain meaning of "operation" as defined by the *American Heritage Dictionary. See The American Heritage Dictionary of the English Language* 1233 (4th ed.2000). It is less clear, however, that the prescribed DFA tasks in this solicitation "cause [the cafeteria] to function," within the meaning of the term "operate" as that term is defined by the dictionary on which defendant relied. *See* Def.'s Surreply at 2 (quot-

ing *Merriam–Webster's Collegiate Dictionary* 813 (10th ed.2002)). Because the court finds, upon examination of the statutory and regulatory language, that the terms "to operate vending facilities" and "operation of cafeterias" in the RSA are "capable of being understood by reasonably well-informed persons in either of two or more senses," *see* 2A *Singer, supra,* § 45:02, at 14, the court's inquiry does not end here. Consistent with the principles of statutory construction, *see id.* § 45:02, at 14–15 (stating that to resolve an ambiguity, the court may consider other evidence), the court also considers the legislative history, DOE general policy pronouncements and adjudicatory decisions.

### b. Legislative History

The parties make only one clear point about the scope of the term "operation" from the Senate Report No. 93–937, the summary by the Senate Committee on Labor and Public Welfare of the 1974 amendments to RSA, which added the operation of cafeterias to RSA coverage. That point, made by defendant, is that in the summary of the amendments, the Senate used the phrase "operation of a cafeteria" but never used the phrases "pertaining to" or "pertains to" cafeteria operations. Def.'s Surreply at 6. Defendant's observation supports the conclusion that 35 C.F.R. § 395.33(c) is a transition provision that does not affect the interpretation of the balance of the implementing regulation.

The parties also argue from language in the preamble to the 1977 implementing regulations. *See* Def.'s Surreply App. at 95–102 (containing the preamble to the implementing regulations promulgated by the Department of Health, Education, and Welfare,[12] entitled "Supplementary Information," issued in March 1977). *See also* 1A Norman J. Singer, *Statutes and Statutory Construction* § 31:6, at 723–24 (6th ed. 2002) ("When a regulation is legislative in character, rules of interpretation applicable to statutes should be used . . . ."); 2A Singer, *supra,* § 47:04, at 222 ("In case any doubt arises in the enacted

12. The Department of Health, Education, and Welfare preceded the Department of Education as the agency with regulatory responsibility un-

der RSA. *See* Act of October 17, 1979, Pub.L. No. 96–88, Title VI, 93 Stat. 696.

part, the preamble may be resorted to help discover the intention of the law maker.").

Defendant asserts that "[t]he preamble supports the principle that the contracting officer possesses a role in the practical administration of the Act." Def.'s Surreply at 7. In support of its position, defendant relies on the language in the preamble addressing the use of vending facility permits stating that a " 'cooperative administrative relationship [is] necessary for the effective functioning of the vending facility program on Federal property.' " Def.'s Surreply App. at 98 (quoting 42 Fed.Reg. 15802, 15804 (Mar. 23, 1977)). In fact, this language is of limited use because the language is embedded in a discussion, not about cafeteria operations, but about certain formal aspects of the relationships between federal agencies and state licensing agencies.

With respect to defendant's argument that food preparation is the key element in the operation of a cafeteria, *see* Def.'s Surreply at 2, 4, the court observes that the preamble defines the term "cafeteria" to distinguish "cafeterias from other types of vending facilities covered by the Act." *Id.* at 101A (quoting 42 Fed.Reg. at 15809). A cafeteria is "defined as a food dispensing facility where the customer serves himself prepared foods and beverages from displayed selections and eats at tables or booths which are located within the premises." *Id.* The preamble states that a cafeteria may include "a fully automated facility consisting of a number of vending machines" if a broad range of food items is available to patrons and seating is available within the facility. *Id.* This definition suggests that the preparation of food in the cafeteria is not, as defendant argues, the determinative factor in the operation of a cafeteria.

The preamble also clarifies the scope of the requirement that an agency consult with the Department of Education. DSB asserts that DOE "has instructed that ... contracts be submitted for review to determine i[f] the priority applies." Pls.' Reply at 10. The preamble addresses two instances when consultation with the Department of Education is required. The first instance occurs "when an offer submitted by a State licensing agency for the operation of a cafeteria is determined to be within the competitive range." Def.'s Surreply App. at 101A. In this instance, "the contract is expected to be awarded to the State licensing agency" following consultation by the federal agency with the Department of Education. *Id.* The second instance occurs when a contract has been determined by the agency to be subject to the RSA, but the agency believes that the "operation of a vending facility by a blind vendor might adversely affect the interests of the United States." *Id.* at 100A (quoting 42 Fed.Reg. at 15807). In the second circumstance, the federal agency shall "justify" its position to the Secretary "who will make the final determination." *Id.* Neither of these circumstances applies to the facts of this case, which involves a determination by DOD that a DFA service contract is not covered by the RSA.

The preamble also makes clear that the DOE considered and rejected the possible establishment of "an administrative appeals process for those cases where the proposal submitted by the State licensing agency [SLA] was not ranked within the competitive range and could therefore not be selected for final award." *Id.* at 101A (quoting 42 Fed. Reg. at 15809). The preamble notes that such a procedure would have afforded an SLA "the opportunity to request [that] the Secretary ... review the bidding procedures in order to assure that the criteria for establishing the competitive range [was] properly applied." *Id.* The preamble explains that the proposed administrative appeals process was not adopted because "the Randolph–Sheppard Act does not provide the Secretary with the authority necessary to enforce an adverse decision arrived at on the basis of an administrative appeals process but does provide a remedy with enforcement authority in connection with the arbitration of [SLA] complaints." *Id.* The preamble explains DOE's expectation "that when a[SLA] is dissatisfied with an action resulting from its submittal of a proposal for the operation of a cafeteria, it will exercise its option to file a complaint with the Secretary under [20 U.S.C. § 107d–1(b)]." *Id.* The preamble does not support DSB's contention that there is any pre-award

consultation requirement that would apply to the circumstances of this case.

### c. DOE's General Policy Pronouncements

Some guidance regarding the interpretation of "operation" exists in the general policy pronouncements issued by DOE's Commissioner. In March 1992, then DOE Commissioner, Nell C. Carney, issued a letter (the 1992 Carney letter) to the Committee for Purchase from the Blind and Other Severely Handicapped (Committee for Purchase) addressing the DOE's interpretation of "operation" of a cafeteria and whether RSA applies to DFA contracts. The letter states:

> Although this determination ultimately needs to be made on a case-by-case basis, we believe that the following standard will be helpful to the Committee in identifying those instances where there is a possibility of conflict with the Randolph–Sheppard Act priority. If the food service contract requires the contractor to provide a wide variety of food services and DOD personnel play a very limited or no role in the overall functioning of the cafeteria, then there is a strong possibility that the food service contractor has undertaken the operation of a cafeteria. In such a case, DOD is not operating the cafeteria on an "in-house" basis, and, as a result, contracting out for those operational services with a party other than a licensed blind vendor poses a conflict with the Randolph–Sheppard Act. On the other hand, if the food service contract calls upon the contractor to provide a limited number of discreet (sic) food services, and DOD personnel play an important role in the overall functioning of the cafeteria, DOD would be viewed as operating the cafeteria on an "in-house" basis and, as a result, the food service contract would not conflict with the Randolph–Sheppard Act.

Def.'s Surreply App. at 104–05.

The Carney letter was viewed as providing too broad a justification for removal of contracts from RSA coverage and was rescinded in January 1999 by another letter to the Committee for Purchase issued by DOE Commissioner Fredric K. Schroeder (the 1999 Schroeder letter). *See id.* at 107–08 (containing 1999 Schroeder letter). The 1999 Schroeder letter states in pertinent part:

> I have determined that the basis provided in Commissioner Carney's letter for determining whether the provision of food services consists of the operation of a cafeteria is too limiting given that one of the purposes of the Act is to expand the opportunities for individuals who are blind to operate cafeterias on Federal property. Consistent with this purpose, the regulations promulgated pursuant to the Act, in 34 C.F.R. 395.33, require a military base to consult with the Secretary about awarding a State licensing agency (SLA) a priority under the Act whenever it solicits offers for the operation of a cafeteria and finds the SLA to be within the competitive range.
>
> Based on the foregoing, [DOE] is in the process of reexamining the issue of what food services on military bases constitute the operation of a cafeteria under the Act.... In the interim, [DOE] will assess issues that arise on a case-by-case basis.

*Id.* at 107.

DSB argues that, since the issuance of the 1999 Schroeder letter, "[DOE] has instructed that DFA contracts be submitted for review to determine i[f] the priority applies." Pls.' Reply at 10. In support of this argument, DSB relies on the August 2003 opinion letter issued by DOE Commissioner Joanne M. Wilson addressing a pre-solicitation notice issued in January 2003 for a solicitation at Fort Lewis, in which she stated that "[s]ince 1999, it has been [DOE's] policy that contracts for dining facilities attendant services need to be assessed on a case-by-case basis to determine whether they are covered by the Act." *Id.; see also* Pls.' Mem. Ex. 3 (containing the referenced letter). Commissioner Wilson's letter does not state, as DSB suggests, that the "case-by-case" assessment is to be made by DOE, or even by DOD in consultation with DOE, views which, if intended, would have been easy enough to express.

Defendant asserts, and the court agrees, that the 1999 Schroeder letter supports the view that "DFA contracts are not inherently

subject to the Act" because "the case by case analysis [must] mean[ ] that not every such contract is to [be] issued subject to [RSA]." Def.'s Surreply at 12.[13]

d. Adjudicatory Decisions

The United States District Court for the Western District of Louisiana is the only federal court that has directly addressed the interpretation of the term "operation" under RSA. *See La. Office of Rehab. Servs. v. United States Dep't of the Air Force*, Civ. No. 98–1392, slip op. (W.D.La. Mar. 29, 2000); Def.'s Surreply App. at 142–151 (containing a copy of the decision). In that case, the district court reviewed the decision of an arbitration panel convened by the Department of Education pursuant to 20 U.S.C. § 107d–1(b) after the SLA filed a complaint challenging the Air Force's decision not to apply RSA because the Barksdale, Louisiana contract did not require the "operation" of a cafeteria. Def.'s Surreply App. at 143–44; *see also* Def.'s Surreply App. at 198–211 (containing the decision of the arbitration panel, *La. Dep't of Social Servs., Rehab. Servs. v. United States Dep't of the Air Force*, Case No. R–S/97–3 (June 1, 1998)). The Air Force issued a solicitation outside of the RSA for mess attendant services for the reason that "[i]individual tasks such as mess attendant, janitorial services, or grounds maintenance that support Air Force operation of a dining facility are not covered by the Randolph–Sheppard Act." Def.'s Surreply App. at 200 (quoting Air Force memorandum rejecting protest from SLA regarding the Air Force's decision not to apply RSA).

The arbitration panel decision upheld the Air Force's interpretation. *Id.* at 211. "Central to the panel's majority decision was the finding that Air Force personnel, and not the contract recipient, would be operating the mess hall." *Id.* at 144.

The district court reviewed the interpretation of the word "operation" and considered whether the determination by the Air Force that a contract assisting in the operation of a cafeteria does not trigger RSA was arbitrary or capricious. *Id.* at 144–45. Relying on the guidance provided in the 1992 Carney letter for the factors to consider in conducting a case by case analysis, the court found that although "all cafeteria workers have some quality control function," the "Air Force personnel [were] responsible for ordering and receiving food and supplies, determining menus, maintaining inventories, control for spoilage, and insuring that the costs of operation remain[ed] within budget allowances." *Id.* at 149. Concluding that there was sufficient evidence to support the panel's factual determination that the Air Force "operated" the cafeteria, the court affirmed the panel's decision under an APA standard of review. *Id.* at 144–45, 150. The persuasive force of the opinion in this case is diminished, however, because the court relied heavily on the 1992 Carney letter, *see* Def.'s Surreply App. at 147–48, which is no longer effective.

The court has also been made aware of the decisions of two other arbitration panels convened under 20 U.S.C. § 107d–1(b) that have interpreted the term "operation" in the context of RSA. *See* Def.'s Surreply App. at 152–75, 109–36. The decisions of the panels, while considered "final agency action[s]" under RSA, 20 U.S.C. § 107d–2(a), are not entitled to *Chevron* deference because they are not adopted pursuant to any formal rulemaking or notice and comment procedure. *See* footnote 6, *supra.*

---

**13.** The plurality opinion in *Texas State Commission for the Blind* stated that in the dispute before it, "[w]hile [DOE's predecessor agency] was the coordinator of the program throughout the government, it was only on a par with DOD in an interagency legal dispute before Justice." 796 F.2d at 414 n. 22 (citing Exec. Order No. 12,146, 3 C.F.R. § 409.411 (1980) (authorizing executive agencies to submit disputes to the Attorney General for resolution)). That position was disputed in the dissenting opinion, which argued that Executive Order No. 12,146 had no relevance, 796 F.2d at 428 (Smith, J, dissenting), and that in the case of conflicting regulations between two agencies, the respective authority to be accorded the views of each agency should be determined "only in reference to the [RSA]." *Id.* at 429. In this case, unlike *TSCB*, there are no regulations before the court affecting this procurement as to which DOE and DOD offer conflicting interpretations. The issue is whether DOD's interpretation of the DOE regulations is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4).

In *State of Alaska Department of Education Division of Vocational Services v. United States Department of the Army,* Case No. RS/97/2 (Jan. 12, 2000), a panel reviewed the Army's decision not to apply RSA to a DFA contract at Fort Richardson, Alaska. *See* Def.'s Surreply App. at 152–175. In connection with that contract, DOE Commissioner Schroeder issued the 1999 Schroeder letter rescinding the 1992 Carney letter. *See id.* at 163–64 ("Commissioner Schroeder ... rescind[ed] his predecessor's determination that RS[A] priority only applied where military personnel 'played a very limited or no role in the overall functioning of the feeding facility.' "). While acknowledging that the application of the priority will be determined on a case by case basis, the panel concluded that RSA does not apply "[w]here the contracts are for discrete services rather than the overall 'operation' of the dining facilities." *Id.* at 168. The panel decided that RSA did not apply to the Fort Richardson DFA solicitation because it was "for scrubbing pots and pans, with the only contact with food being the placement of potatoes into the mechanical machine that abraded their skins." *Id.* at 164. The panel reasoned that the tasks prescribed by the DFA solicitation "do not constitute the operation of a cafeteria because no vending occurred, no concession was involved and there was no entrepreneurial activity of any type contemplated by the Randolph[-]Sheppard Act." *Id.*

In *Commonwealth of Kentucky Cabinet for Workforce Development Department for the Blind v. United States Department of Defense and Department of the Army,* Case No. R–S/01–11 (Aug. 20, 2002), an arbitration panel reviewed a DFA solicitation issued by the Army for Fort Campbell, Kentucky. *See* Def.'s Surreply App. at 109–36. By majority decision, the panel found that "dining facility attendants in this setting [are] appropriately deemed to be services under the Randolph–Shep[p]ard Act." *Id.* at 120. The panel stated that "[t]o exclude the dining facilities attendant services would frustrate and is inconsistent with the priority afforded blind persons in military settings," and added that "[t]o deny the blind ... cafeteria work at military installations because food preparation is performed by the Army is to deny

blind persons the effect of having priority for such work." *Id.*

DSB asserts that the Army's proposed DFA contract at Fort Lewis is "an attempt to avoid the priority" of RSA, and likens the Army's course of conduct in this case to that in the Kentucky case considered by the arbitration panel. Pls.' Reply. at 13–14. Quoting the concurring opinion in the Kentucky case, DSB urges this court to reach the same conclusion as the majority of the arbitration panel in the Fort Campbell case:

> The record establishe[d] the Agency [the Army] engaged in conduct calculated to eliminate the KDB and its blind licensee from performing services in military dining facilities at Fort Campbell, Kentucky in violation of the spirit and intent of the R–S Act ... [.] The Agency lacks authority under the R–S act or implementing regulations to make a unilateral determination that services performed in military dining facilities that have been determined to come with the definition of a "cafeteria" under the R–S Act are no longer covered. Since the dining facility attendant services to be performed pertain to the operation of a "cafeteria" then the services are covered by the R–S Act.

Pls.' Reply at 14 (quoting text in Def.'s Surreply App. at 125–26).

The Fort Campbell, Kentucky, and Fort Richardson, Alaska cases, both of which are final agency decisions, illustrate the difficulty of the DSB's argument. There is, given the state of DOE guidance and the fact that DOD is entitled to make determinations on a case-by-case basis, no legally-required answer to the question of whether a DFA services contract, at least as to a contract, like the one at issue here, which is similar to or narrower in scope than the Fort Richardson, Alaska contract, is covered by RSA or not.

Having considered the language of the statute and the regulations, the legislative history, the policy pronouncements by DOE and several decisions by arbitration panels convened in accordance with RSA, and in the absence of any other guidance by DOE, the court finds that the basis for defendant's interpretation of the term "operation of a cafeteria" is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Within the limited scope of this court's review, the court does not substitute its judgment for that of the agency, *see Bannum,* 56 Fed.Cl. at 457 ("A reviewing court cannot substitute its judgment for that of the agency ...."), and upholds the decision of an agency if there is a reasonable basis for the agency's action. *See MCS Mgmt., Inc. v. United States,* 48 Fed.Cl. 506, 510–11 (2001) ("[I]f the Court finds a reasonable basis for the agency's action, the Court should stay its hand ....").

Because the merits issue here is determinative, the court need not address any of the other bases for DSB's request for injunctive relief. In light of the denial of the preliminary injunction motion, the court need not determine the proper party status, if any, of Mr. Ott in this matter, and Robert Ott's Motion to Re-Align as Plaintiff-Intervenor is MOOT.[14] The parties are in agreement that the disposition of the plaintiff's motion for an injunction is effectively a disposition of this action. *See* Oral. Arg. Tr. at 27–28 (plaintiff stated that "if the Court is not persuaded [that the RSA applies to the DFA contract,] ... the Court could ... dismiss this case ...."); 77–78 (defendant stated that "if the court finds that the contracting officer was reasonable ... the Court is bound to uphold the procurement and deny the injunction."); TSC Tr. 12/16/03 at 101. Defendant has filed a Motion for Judgment Upon the Administrative Record which the court GRANTS.

III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Referral of Issues is DENIED, and, based on the unlikelihood of DSB's success on the merits, Plaintiffs' Motion for a Preliminary Injunction is also DENIED. Defendant's Motion for Judgment Upon the Administrative Record is GRANTED. The Clerk of the Court shall enter judgment for defendant. No costs.

IT IS SO ORDERED.

---

14. The following pending motions are also MOOT: (1) Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction filed August 29, 2003; and (2) Plaintiffs' Motion for Expedited Briefing and Hearing filed December 2, 2003.